Pratt, J.
(dissenting.)—This is an appeal from a judgment entered upon a verdict directed by the court izi an action of ejectment. Bach party requested the direction of a verdict in his favor.
The question to be determined is whether the locus in quo, being the land under the waters of Mecox Bay, L. I., fs the private property of the defendant, or is a part of the common lands of the town of Southampton.
' Mecox Bay is a large, body of fresh water, into which fresh water flows from the adjacent lands in the town of Southampton. Its waters do not ebb and flow with the *517 tides of the ocean, except at extraordinary neap tides, when the ocean overleaps the beach, or when a channel is cut through. These inlets are annually stopped by accumulations of sand. They have been stopped for months at a time. They are cleared occasionally in part by natural pressure of the water, which accumulates behind them from the land; but this natural process is often, perhaps generally, assisted by the labors of the people. Its waters are used for local navigation, and when the inlets are open they afford a passageway for light draft vessels to and from the ocean through Fire Island inlet.
The plaintiffs insist that it, the town, owns the .ands under the waters of this bay, below low water mark for the benefit of its inhabitants, as common land, and asserts that defendant, a corporation, claims to own the same land, with the right to exclusive control thereof, and that it has entered thereon, planted oysters in beds, over which it has exercised, and attempts to continue, the exercise of exclusive ownership and control. The defendant admits these acts and justifies them on the ground that it is the owner of the land.
It is not denied that the rights of both parties are subject to the public right to navigate these waters. But the decision in The Trustees of Brookhaven, etc., v. Strong (60 N. Y., 56), if there was any earlier doubt about it, settles the _ doctrine that, notwithstanding the public rights to ■ navigate these waters, the land under water below low water mark, may be the subject of exclusive ownership, based on grant or prescription. We are, therefore, remitted to that question, whether or not either of these parties are such owners, by grant or prescription.
Having the affirmative of the issue, the plaintiff, the town, was, of course, bound to establish its title to these lands, certainly by a better title than that under which the defendant claims.
For the purposes of a general statement, the evidence of title may be classified thus: The acts of the original set-tiers prior to any grant in evidence; the patent by James Farrett, deputy of the earl of Stirling, secretary of the kingdom of Scotland, dated April 17, 1640; the grant from the Shinnecock Indians, December 13, 1640, and confirmations thereof; the patent of Edmund Andros, governor-general under James, duke of York, dated November 1, 1676; the patent of Thomas Dongan, captain-general, governor under his majesty, James the Second, dated December 6, 1686; and the acts of the parties who claim title under these grants. It may, also, be well in this connection to note the fact that the control of these lands, after the original settlement, seems to have been exercised by *518 the freeholders, eo nomine of the territory composing the township, for many years both before and after the Andros and Dongan patents. And much confusion exists in the evidence arising out of the fact that, almost from the beginning, the original settlers, were accustomed to speak of themselves as “a town,” and their records show that their lands were under the control of “the inhabitants,” who expressed their will at “town meetings.” This practice was followed by their successors until 1676, when the town received the first charter; and sometimes the same confusion is found in the subsequent records. Afterwards a distinction was noted between the freeholders as individual proprietors, and the town, the former calling themselves “proprietors,” and acting through representatives called “trustees,” a distinction, which, in my view of the case, is of vital importance. In April, 1818, these proprietors as a party or association were recognized by an act of the legislature of this state which was passed to facilitate the transaction of their business.
It is claimed by the plaintiffs that the questions at issue turn upon the construction of the Andros and Dongan patents, and that it has been settled in their favor, so far at least as this general term can settle it, in the case of Atkinson v. Bowman, 5 N. Y. State Rep., 46.
_ The defendant, on the other hand, insists that the questions are res adjudicata in its favor, under an unreported decision of the general term of this district in the case of Rose and Jagger v. Phillips, July, 1867. But it also insists that, if the questions are still open, they must be determined upon all the evidence, and that an examination thereof demonstrates its title.
I may also premise that the real difficulty in the case is to determine whether these acts of the settlers, grantees, freeholders, proprietor or persons, by whatever name they were called, were by them, in their capacity as a real or quasi public corporate body, or as individuals managing their acquisitions as tenants in common of private property.
It will be convenient to take up the earliest grants of which we have any suggestion, and ascertain their meaning and force by study of their terms, and then to see whether or not there is any irreconcilable inconsistency between the inferences which we shall thence draw and those which are fairly deducible from other facts, whether antecedent or subsequent.
The first of these grants was under the authority of the Earl of Stirling, by James Farrett, his deputy, by means of an instrument dated April 17, 1640, and known as the Farrett patent. There is some uncertainty about the exactness of this date, arising from the fact that the con- J *519 ürmation thereof seems to have been dated in August, 1639. The evidence before us does not indicate the source of this earl’s title or claims. But we need only to recall authentic history to see what they were. William Alexander, of Menstrie, Scotland, was the first Earl of Stirling. He was born in 1580, and in 1604 became attached to the court of King James I, of England (VI of Scotland). On September 10, 1621, he received from James I, a royal charter of a territory covering much of what is now known as Canada, including Nova Scotia, to be called New Scotland, with power to charter cities and other municipalities and exercise ■other functions of government. He published a prospectus inviting emigration, and expended a large fortune in his efforts to colonize this northern territory. His grants were afterwards confirmed by Charles I, the son and successor of James I, by royal charters, July 12, 1625, dated July 25, 1626, February 2, 1628, attested October 11, 1630. It is ;said by some historian that some one of the grants issued to Stirling covered a part of the territory of the Plymouth ■company, established under the royal charter granted by James I, April 10, 1606, to Sir Thomas Gates, which latter grant unquestionably included Long Island, and authorized the chartering of towns and the functions of government. But be that as it may, this New England colonial government, at the request of Charles I, issued its charter to William, Lord of Stirling, April 22, 1635, pursuant to an act of the council passed February 3, 1634, clearly covering the island, designating it by its several names under the Indians, “Mattoax,” under the Dutch, “Nassau Island,” and provided that it should thence be known as the “Isle of Stirling.”
This grant covered every conceivable interest or right to the land waters and every possible appurtenance, together with the power of estabhshing bodies corporate and politic, and the power of government in general, saving certain judicial power. Its text may be conveniently referred to in a bound volume relating to a litigation in England, about 1830—1833, respecting the claims of one of his descendents, .and in a volume published by the “ Prince Society” in 1813, both of which are in the Long Island Historical Society library. I am aware that a note in the latter, indicates a doubt about the indentity of this grantee with the original Earl, intimating that it was to his son. But the action of' Governor John Winthrop (to be presently noted) respecting the Farrett patent could scarcely have been predicated on any mistake of that nature. And besides, that the London documents found, I think, in volume third, of the Documentary History of New York, contain a petition to the King, Charles I, by this same son in which he recites the *520 fact of the grant to his father, and prays assistance against Dutch encroachments on the Island. There is no evidence in extenso that the King, himself, ever issued a patent of this land, or .a charter of governmental power to be exercised on the Island, to the Earl of Stirling. But the recitals in this instrument, both by the Earl and Farrett, his deputy, strongly indicate a grant of the land by patent from the King himself. The Farrett patent contains this clause : “But inasmuch as it has pleased our Royal King to give and grant the patent of Long Island to the aforesaid Earl.” The Earl’s confirmation of the Farrett patent, distinctly refers to “my patent ” as covering Long Island, and the record made by John Winthrop, governor of Massachusetts bay, dated August 20, 1641, indorsed upon the Farrett patent, undoubtedly recognizes the existence of a sufficient patent, under royal authority, to this Earl. All this was done within the reign of Charles I.
The Earl’s authority to Farrett, distinctly appears. His. confirmation recites the agency and “ power ” as conferred in “April 1631,” and the grant of April 22, 1635, clearly authorizes him to act by deputy or agent.
This Farrett patent recites the fact that he (Farrett) “hath formerly purchased lands in Long Island for the Earll of Stirling or him self e.” We have no other evidence that Farrett himself had any interest in the subject of the patent, except the fact that he plainly joined in the patent, thereby releasing any individual rights which he had. It is worthy of note that this instrument plainly attests a sale of lands as distinguished .from a voluntary grant; and, although the exact consideration is not expressed in the body of the paper, it makes provision therefor, viz: that it shaU be fixed by Governor Winthrop as a sort of arbitrator. The grant is from the Earl, under this “ power ” by Farrett as his deputy. It runs “to DanyellHow, Job Sayre, George Welbe and WilliamHarker, together with their associates.” Another clause refers to “ the aforesaid Daniel How and his copartners,” evidently referring to the other patentees and the “associates.” The patent purports to “give and grant fEree leave and liberty” to said patentees “to sitt downe upon Long Island aforesaid, there to possess, improve and enjoy eight miles square of land, or so much as-shall contain the said quantity, nott only upland, but alsoewhatsoever meadow marsh ground, harbors, rivers and creeks lye within the bounds or limits of the said eight miles, the same and every part thereof quietly and peacably to enjoy to them and their heires forever.” It generally reserves to the Earl the right of trading with the Indians; but authorizes How “and bis copartners” to choose one of their members who may trade with the Indians within. *521 their own plantation “for any victuals,” “but not for wampam.” A later clause expressly gives these patentees, viz., those named and their associates, the right to buy in the Indian titles or claims “in their own names and at their own leisure,” “and thereby to assume it for themselves and their heirs as their inheritance forever.”
It makes the following provision in respect of considera-» tian for the grant, viz: “ That whatsoever shall be thought meet by the right worshipful John Winthrop, Esq., governor of Massachusetts Bay; to be given to the Earl of' Stirling in way of acknowledgment, as the patentee of the place, shall be duly and truly payed.” And the fact was that Governor Winthrop subsequently and on August 8, 1641, by an indorsement on the patent, fixed “foure bush-ells of the best Indiane come theire growing ” as the thing to be yearly prid, and took pains also to refer to the following fact, that these people had already settled on the land referred to in the patent, and ‘ ‘ possessed and improvecL this place ” before it was granted, and that this payment was rather by way of acknowledgment of the Earl’s interest than as an adequate compensation for the land.
1 The plaintiff’s counsel challenge the force of this grant, because it does not definitely describe any particular lands. But we shall presently see that these patentees were in possession and had made improvements on the property at the time. Governor Winthrop expressly refers to this fact, in his indorsement as a reason why he fixed the consideration at so insignificant a sum. Besides that it certainly was good as granting a right to locate and to buy in the Indian titles to land definitely described. And after that had been done, it would be quite too late for the earl, or any of his descendants, to question the force of such a document to confirm and perfect a title, assuming its existence in the earl. But I do not deem this point of importance by reason of later royal confirmations to be presently noted.
Another suggestion may be here noted—the idea that a grant to these men and “their associates,” was too indefinite to effect a grant to the “associates.” Grant that this is true as a proposition of law, for the sake of the argument, we shall, by and by, see that the point is utterly immaterial, because these “associates,” obtained all their rights and title under what may be called the “undertakers’ agreement ” (post).
We may, also, without going beyond title deeds, obtain some glimpse of the names of the “ associates,” who are referred to in this patent by Farrett. For, on December 13, 1640, certain Indians “on the one part,” and Mr. John *522 •Gosmer, Edward Howell, Daniel How, Edmund Needham, Thomas Halsey, John Cooper, Thomas Sayre, Edmund Farrington, Job Sayre, George Welbe, Allen Breade, William Barker, Henry Walton, “on the other part,” entered into a certain deed whereby, in consideration of certain property and of promised service for defense against other Indians, the former, “doe absolutely and forever give and grant, and by these presents doe acknowledge ourselves to have given and granted to the partyes above-mentioned, to them and theire heirs and successors forever, the lands, woods, waters, water courses, easements,” etc. And here follows a description of premises, which undoubtedly include the Southampton township and this Mecox Bay. It cannot fail to strike the examiner of these two documents, that all the names mentioned as grantees in the patent, viz.: How, Job Sayre, Welbe and Barker, are grantees in the Indian deed, and there can scarcely be a doubt that the remaining grantee in the latter, viz.: Gosmer, Howell, Needham, Halsey, Cooper, Thomas Sayre,' Farrington, Breade and Walton were the individuals referred to in the patent, in one place as “ associates,” and in another as “co-partners.”
The evident object of the two instruments was to consolidate the title from these two sources, the one through the royal grant and the other from the Indians, as the natural owners of the land. No “associates” are referred to in the Indian deed; and the idea that How, Job Sayre, Welbe and Harker should have purchased for themselves and their “associates” or “co-partners” in the one case, .and then have united in a purchase of another outstanding, adverse interest in the name of particular individuals—an act which would necessarily exclude any others—is to violate duty and presume a wrong in preference to a right. And besides even this, the Indian deed was evidently ■obtained in strict pursuance of, and was in a sense dependent on, the provision of the patent which, at least, gave the patentees—that is to say, those named and their “associates ”—the right to obtain the Indian title “ in their own names,” and provided heavy penalties against any other ■dealings with the Indians, except for “victuals.”
Let us not forget, in passing, to note a distinction made by the learned trial judge in his opinion, not indeed in respect of this patent, for he puts his decision clearly on the Andros and Dongan charters. . But no matter about that. The point, if there is anything in it, applies with equal force to this one, viz.: That the term “associates,” being an indefinite term, was insufficient to pass a legal title to them. Grant that this was so. The patent then certainly created .a trust for their benefit, and gave them an equitable inter *523 est or estate under Jackson v. Sisson (2 Johns. Cas., 321). Assume, then, that the legal estate vested in the specified .grantees. But this was followed by the Indian deed which named them all as we shall presently see. There was, therefore, a legal estate of all that the crown could grant in the specified grantees, subject to the equitable estate of “ the associates,” and a legal estate of all that the Indians could grant in the entire part. And this equitable estate was not one arising constructively, but by the express terms of the grant. I incline to think that the act of the whole party joining in the Indian deed, would merge the equitable into a purely legal title, by estoppel, if not by reason of the nature and character of the Indian title thus conveyed:
For observe, the Indian deed recites the Indians as the “true owners of the eastern part of Long Island.” How -could the specified grantees of the Farrett patent ever be heard to assert any adverse legal title or interest in themselves, as against these associates, after uniting with them in such a transaction ? We shall take up this point again later on. But we must note now and remember that the only possible doubt about an entire legal title in the Indian grantees, i. e.,the whole party, associates and all, is because of a trust for the specified Farrett grantees, a trust attested by a written instrument, and is riveted by another writing .signed by all these specified grantees and their associates, which fully expresses a consideration, etc. This vests the title to the lands before they were divided into lots. We shall see what becomes of this possible interest in the commons later on.
We may now profitably note several important facts in this connection, viz:
First. This grant has nothing whatever to do with governmental power. It does not purport to organize or to delegate any authority to organize, much less can it be said to be á conveyance to or for the use or benefit of any body corporate or politic. Even the word “ town,” upon which .the plaintiff’s argument is so largely based, is not so much as used in either of the papers. And the latter suggestion is equally true of Gov. Winthrop’s indorsement on the former.
Second The terms of the Farrett patent absolutely exclude the idea that it was in trust for anybody or class of persons, unless it be in the grantees named, for themselves and their unnamed “associates or “copartners.” The instrument contains no habendum, clause in the usual form. But it does say this: “ The same (said eight miles square) and every part thereof quietly and peaceably to enjoy to them and their heirs forever.”
There is not so much as one word about successors in it. *524 True, the instrument grants the patentees and their associates “full and free liberty in all matters that do or may concern them or theirs, or may “conduce to the good and. comfort of them and theirs, both in church order and civil government.” But these are not words granting corporate power, much less do they imply a franchise to a. definite association or body of individuals. The language is in marked contrast to the careful verbiage of the Plymouth grant to the Earl touching such power; and it Can scarcely be presumed that Farrett’s omission to use more definite language, in this respect, arose from ignorance when he had such a precedent before him. Besides this, the general form of the instrument is that of a simple conveyance of land, reserving the right of trading on this land with the Indians, a reservation which goes far to show that the Earl intended to retain every power which did not pertain to the property in the land, to be enjoyed by him with his other property on the island. And this certainly is true: That there is no evidence of any intent to impose the slightest limitation upon the grant to the use of for the purpose of forming a body politic or corporate. There was no such body corporate, and the patent does not even purport to erect one. On the contrary, the use of the words “co-partners ” throws a flood of light over the whole transaction.
Of course, it will be said that the word “ successors ” does occur in what may be called the habendum clause of the Indian deed. But that seems to me to have been done rather in the sense of assigns; and we shall presently find a confirmation of this view. It must be read in connection with the limitations which were imposed on the patentees' by the Farrett patent in this respect, viz.: that they might purchase the Indian rights “in their own names * * * to themselves and their heirs as their inheritance forever.’’
I think it may be safely asserted, that this Farrett patent, upon its face, bears every attribute of a purely private purchase for private, as distinguished from public or corporate, use; that there is nothing in- it upon which to build the latter theory, and that this is equally true of the Indian deed.
Let us now go back and ascertain who these patentees and Indian grantees were. Let us see if it is possible to build up any theory of the existence of a corporate body in the antecedent history or acts of these grantees. For the. evidence, aided by a few facts from authentic history, of which we must take judicial notice, enables us to determine, with reasonable certainty, who they were, the nature of their relations and their purposes in making these purchases.
*525 It is undisputed that the early English settlements on this portion of the Island, were by pioneer companies or parties of individuals from New England. The first settlements on the Island were from 1625 to 1636. The Dutch came first, and the English arrived about 1640, the latter settling towards the east end of the Island. A record called the “ Town Book, No. 1,” was offered in evidence, the first entry in which, is under the date of March 10, 1639. It is signed by Edward Howell, Daniel How and Henry Walton. How, was one of the patentees named in the Farrett patent, which was made in that year (if we go by date of the Earl’s confirmation), or in the year following (1640) if we follow the date of the patent itself. All of them are grantees in the Indian deed.
It is tolerably plain that this record was made before these persons arrived on the Island, for the reason that it bears internal evidence that they, with others, were contemplating a voyage from the “Towne of Lynne” (on Massachusetts bay), to locate a proposed plantation, and were settling details about a vessel for that purpose. This record indicates that How, Howell and Walton, and perhaps Edmund Farrington, Josias Stanborough, George Welbe, Job and Thomas Sayre and Edmund Needham were the original projectors of the voyage. They call themselves “ undertakers,” and they constituted some sort of a “ company.”
Their writing recites that Allen Breade, Thomas Halsey and William Barker, “ are by the consent of the company-come into and party undertakers with us.” It is, also, evident that this company was a private business association of individuals, in which How and Howell owned three shares each and Walton two shares, for they provide shares for their new associates. Howell, How and Walton each give up one share and the three thus surrendered go to Breade, Halsey and Harker, one share to each. As I read this record, the vessel was thereby sold to How, who agreed to make certain voyages at certain rates; and the shares thus spoken of related to shares in land, which they designed to obtain for their proposed plantation.
I am aware that respectable historians declare that some of the early settlers on the island erected themselves into civil governments similar to those in Massachusetts (Savage’s Winthrop, N. E., vol. 2, p. 34; Neal’s N. E., p. 189). If that was any part of the scheme of those people it failed, because they never acquired independence. They always acknowledged dependence. The statement may have been true in the sense that they did become chartered towns a few years later, but not in any other sense. We shall see that it was not true of this company, by reason of *526 the distinctive indications of an individual association dependent on private shares in a business enterprise. It cer-' tainly is true that this particular “company” obtained m> charter from the Plymouth council or from the king or any of his agents. Some authors say that they erected themselves into companies by the advice of Governor Winthrop or some of the Colonial magistrates. But this only makes it worse for the theory of a corporate body. It shows that they were advised to go without having the S’ant from which alone corporate franchises could proceed. oubtless this was one of the Reasons why they organized as a private company the members of which Parrett called “ co-partners,”—a designation to which they were committed, in a certain sense by this acceptance of this patent, and the certain evidence that they were proceedings on. the theory of shares based on money contributions, certainly gives color to the use of the word “co-partners,” in the patent.
It does not definitely appear when they landed on the island; but the next succeeding entry (which, I think, for the reason already suggested, was made before their arrival),states their project with tolerable certainty. It may well be examined with care, because the learned counsel for plaintiff lays much stress upon the original plans of these men as indicating a purpose to form a public corporate body as distinguished from a private business association. I concur to this extent that that may have been among their ultimate desires, and perhaps, plans; but I feel entirely clear that their purchases of land under these two deeds was an entirely separate affair.
The second entry in this book is signed by Howell, Needham, Stanborough, Walton, Breade, Farrington, Job Sayre, How, Halsey and Harker, “undertakers.” It bears no separate date. It is inconsistent with the idea that it may have been a continuation of the record, under the date of March 10, 1639. It is tolerably clear that it, like the preceding entry, was made and signed before “ the company” started from the “ town of Lynne,” because it makes provision for the transportation of others in the vessel which is-to take ‘ ‘those of our company that are chosen thereunto to go upon discovery and search, and to begin and settle a plantation.” It indicates that the “ others ” were going on “ our account ” (their account). It does not say that they were going as employees, but it is clear that they were not going as “ undertakers.” It recites the confusion which has arisen within their experience or observation of towns, resulting from “ the delayings to lay out the bounds of towns and all lands within the said bounds, have generally been the ruin of towns in this country, i. <?., where they then were. This *527 could not have referred to the island, for there were then no English settlements, much less towns, on the island. They, therefore, declared in advance that the lands of their intended “plantation” should be classified into house lots, planting lots and commons. The house lots should continue to be house lots, and the planting lots should not become house lots, “ whereby more inhabitants might be received into our plantation to the chargeing of commons and the impoverishinge of the towne, and yt also what is laved out for commons shall continue commons, and nae man shall presume to incroach upon it, not so much as by a hand’s breadth.” But in- the same connection, they say say that “ye disposall of all such lands soc laved shall be at all tymes, and from tyme to tyme hereafter, at the will and pleasure of us, the undertakers, or executors, adminis trators and assigns.”
The admission of new undertakers would give them an interest by assignment quite as clearly as in cases of admission of new members into a partnership. The idea seems, to have been that the house lots should lie together, while the planting lots, etc., might be elsewhere, a plan naturally suggested for the purpose of mutual defense. This mere collection of prospective dwellings is in one place distinctly referred to as the “ towne,” i. e., “and also whoever selleth his accommodations in the towne shall sell house and lotts and plantnige lote or lotts and meadow intirely and if' he sell his forme, he shall not devide but sell it together, viz.: his farm intirely, and his accommodations in the towne intirely.”
As I read the brief of plaintiff’s counsel, he concurs in this variable use of the word “towne,” at one time applied to one thing and at another to others. The record then provides that “ whosoever cometh in by us ” shall be satisfied with four acres for his house lot, and twelve acres for a planting lot, and meadow enough to give him fifty acres, unless the undertakers should deem it proper to allow him to have more. Precisely what was referred to by the words “ cometh in by us ” is not clear. The meaning would seem to be “ cometh in with us,” referring to their “ company ” of undertakers, and it may refer to those “ others ” who came with them in the vessel, who had not yet been admitted into the company, but who might come into the settlement through admissions and purchases from individual undertakers after the allotments which they plainly contemplated. We shall see that Cooper and G-osmer were afterwards admitted “as undertakers,” and it is certain that the sales by individual undertakers were contemplated. This record then provides, that the seas, rivex’s, creeks and brooks passing through the grounds of any one were to be. *528 free to all, and that fishing, fowling and navigating on those waters should be common. Provision was then made against the laying out of roads or paths over planting lots, and limiting occupants to the use' of highways to be established, and for the manner in which firewood should be taken from the commons. Then follows a provision, that if the undertakers in their own names, or in the names of the inhabitants in general, in proportion to what they enjoy, should incur any obligation then every person, inhabitants of the plantation, “being owners of land there,” should bear and pay his part. It should be noted that the phrase “inhabitants in general” plainly refers to contemplated land-owners, either by their original contemplated purchase or by sales from these undertakers. A line is drawn across this page after the signatures of the persons described as “ undertakers,” apparently to distinguish them from the persons whose names also appear as signers of this document, viz.: Thomas Newell, John Farrington, Richard 0. Odell, Philip Kyrtland, Nathaniel Kirtland, Thomas Farrington and Thomas Terry. It does not appear why these persons signed the document. It is not unlikely that they were “the others” who -were not a part of the “ company, ” but who were going out in the vessel “ upon our acount; ” because the document makes provisions for limited transportation of goods for such persons, and besides that, ordinary prudence would seem to have required that the rights of the undertakers in the contemplated acquirement of property should be defined and distinguished from those who were to have no such rights. Following this, record is an entry signed by undertakers Howell, Farrington, Needham, Halsey, Breade, How and Walton, certifying that John Cooper was “admitted as undertaker.”
Then follows another entry signed by undertakers Farrington, Cooper, Needham, Walton, Howell, Halsey, How and Thomas Sayre; that after a church shall have been established according to the the mind of Christ, the undertakers should lay down their power at the feet of Christ and his church, provided that they should not do anything contrary to the true meaning of their former declaration. Then follows another entry signed by undertakers Howell, Needham, Walton, Cooper, Barker, both the Sayres, Breade, Farrington and Halsey, certifying that John G-osmer “is admitted an undertaker.” The foregoing recital covers the substance of the entire record of these pioneers, so far as the evidence extends, prior to the date of the Farrett patent, April It, 1640 (or 1689, supra).
An important fact appears which should not be overlooked, viz.: that this association of undertakers, otherwise called “our company,” seems to be based on contributions of. *529 money among themselves. The first entry, relating more especially to the vessel, recites that the following persons, all apparently undertakers (according to the recital), have “disbursed” the following sums respectively: Howell, fifteen pounds; Farrington, ten pounds; Stanboroúgh, five pounds; Welbe, ten pounds; Job and Thomas Sayre, five pounds each; Needham, five pounds; Walton, ten pounds; making in all sixty pounds. The next entry recites that the same persons, with undertakers How, Halsey, Breade and Harker, have together “ disbursed fourscoure pounds for the settinge forward a plantacon;” that is, that How, Halsey, Breade and Harker had contributed twenty pounds in addition to the sixty pounds by the others, and this seems to be the consideration for this arrangement. Take all this in connection with the fact that the Farrett patent refers to How, Job Sayre, Welbe, Harker and “their associates,” as “co-partners,” and we have a nretty clear view of a purely business situation.
Every one of the undertakers are grantees in the Indian deed save Stanborough. It does not appear why he was omitted. But the identity of all the others clearly indicates that this deed ran to the existing, possibly the surviving, undertakers. The title once shown to have vested in individuals, the question is, when and where does it appear in this case that it was divested ?
We may now profitably and more intelligently take up the suggestion of the learned counsel for the plaintiff that these records which precede the purchase from the Earl of Stirling, indicate a purpose to form a body corporate or politic.
I am unable to detect any trace of such a pmpose respecting the property which they designed to acquire. On the contrary, I find nothing in any of these preliminary facts which tends to that view, unless, possibly, the suggestion, that certain of the undertakers—seven out of the fourteen— declared that they would surrender their power “at the feet of Christ and his church,” etc., where it was established. This is the only indication that they ever intended to surrender it to anybody. Their whole scheme seems reconcilable on the theory that they had formed a “company” for the purpose of acquiring land which should Belong to them (in shares) as tenants in common, their heirs, executors and assigns, until it was divided and allotted, and that the part thus allotted should then be held in severalty, which land they proposed to lay out, one part into lots, which were to be allotted or sold for dwellings and farms (including meadows), with reference to roads, and bridges as a part of their roads, and the other part to *530 be reserved to their common use, in all substantial or material respects, analogous to schemes of the present day—• the laying out by one or more men of a plot of land into lots, with reference to streets, all bounded on or having reference to a park intended for private common use. Each allottee or purchaser would, of course, acquire an interest in the common lands; the original undertakers would hold their allotments in severalty and the unallotted lands in common; but the commons, having been dedicated to a particular use, would become impressed with a trust or use for the benefit, first, of the undertakers; and, second, for new allottees or purchasers. (We shall presently see-that this trust or use finally came to be a fee simple absolute.) This, under the terms of the declaration, would, leave the title to the commons, including the waters, fishing, etc., in the undertakers who should obtain title under their plan, their heirs, executors and assigns, subject, as-the paper says, to their disposal as well as control in the common interest, unless there is something in the nature of a surrender of power and estate to be found in the provision about the church, a suggestion which we will consider later on. In a certain sense they were making covenants which they designed to run with the land which they proposed to acquire, and an element of trust was involved; but not for any corporate body, nor even for general public use. I can see no basis for any control except-in their contract. All the suggestions about forming a corporate town fail with the single statement that there was no' body corporate or politic, in fact, capable of taking anything, until the Andros patent (post)-, and, meantime, the title vested in somebody.
Of course, a town as a corporate body, may have been, and probably was, a part of their plan as a thing to be attained some time or other, when they might be lawfully organized as such. But their plans did not limit their purchase to any such use. Even then it would not acquire the-lands, unless there was a gi’ant to it or some trust or use in their original purchase, which would inure to the benefit of an existing corporate body, or those who must necessarily compose it. And it is precisely here, as I understand, the argument of the learned counsel, that his contention begins, viz.: that these commons were dedicated to the use of all the inhabitants or persons who might become inhabitants of the territory acquired. I fail to see any such dedication, in the sense that any inhabitant should acquire an interest who was not first admitted into the company, any more than a purchaser of land in the neighborhood of _ a private park, but not within the covenants relating to it, would obtain any interest in or respecting the park. The- *531 benefits to be derived from these commons were to extend only to those inhabitants who were or should become “ owners of land there.” Is it said that an interest for mere inhabitants, in the broad sense of that term, was a necessary element of the plan of these settlers, otherwise they could not hope to attract new comers? The answer is that this would apply with equal force to the lands designed for allotments or sales for houses and farms, as well as to the commons. It is plain that there were other and quite sufficient inducements to become mere inhabitants, even if they were free to do so, such as always exist in such cases, the hope of employment, the opportunity for purchase and the protection, both of persons and property, against savages or other enemies, all of which is always implied in every permanent aggregation of persons disposed towards peace and good order. Here was a company based on money contributions, looking to a purchase of land for themselves, their heirs, executors and assigns, to be held in shares until partitioned, and thence to be held in severalty, in fee. And it would seem to be going quite too far to assume, in the face of such records, that they intended that any one who might choose to come, should acquire an actual interest in these lands, simply because he came. What would prevent such a comer from leaving the next day? What would become of his interest if he did so leave? Would such a comer have the right to enter upon these commons, and cut and carry away wood? We shall see that this very matter received the attention of these people.
But another, and, I think, an entirely conclusive answer to these arguments, is found in this old declaration, and is uniformly illustrated in their subsequent proceedings for more than a century, viz: They did not propose to have any inhabitants, except such as these undertakers should from time to time admit into their company. This seems to have been a qualification for an “inhabitant,” in the sense in which they used the word. It should not be forgotten that the minds of these early New England people were largely controlled by questions of religion, certainly of morals, and a disposition towards industry and thrift. Evil disposed persons “were not infrequently treated rather severely by the people from whence this ‘ ‘ company ” proceeded in the “towne of Lynne.”
Liberty, as we understand the term to-day, would have been pretty certain to have involved a man, or woman either, in no little difficulty, if he or she attempted to stand on modern notions of his rights among these people. Hence, this qualification of persons who should become inhabitants, was one of the methods designed to give this *532 company control over the persons who should come to settle among them. This idea should be kept steadily in mind, viz.: the limited use of this word “inhabitants,” for it will largely explain the confusion arising from the use of the word in subsequent records and throw light upon the meaning of the phrase “towne meetings,” which were necessarily composed of persons qualified to vote by having been admitted into this association. These records abound with such admissions. Careful lists of existing members were made from time to time and revised. They were called “Freemen,” a term nearly synonomous, as they used it, with “freeholders.”
We pass, in the next place, to consider the declaration of some of these undertakers respecting the church. The first thought which strikes the mind, in this connection, is that this declaration excludes the idea that this power of disposal and control was ever to pass to the town as a corporate body. It was to pass to the church if to anybody. But that was too indefinite to create a valid trust or use. No church was in existence as a corporate body, either when the declaration was made or when the title to land passed. Shipman v. Rollins, 98 N. Y., 311; Burrill v. Boardman, 43 id., 254. And this applies with equal force to the theoretic town corporation. Besides .. that, the declaration was made by only seven out of the fourteen undertakers, and seven out of thirteen of the original grantees. And a final answer would seem to be that the alleged rights of the town are not based on any such theory. Nor is there any trace of public use, as distinguished from private enjoyment, either in the Farrett patent or the Indian deed, nor even in Governor Wirithrop’s endorsement. True, he refers to the “four bushels of com” to be paid by the “inhabitants;” hut we have seen that term used in'a limited sense, and, besides that, it evidently refers to the “ said inhabitants ” mentioned in the body of the patent, to be paid by the patentees, How, Job Sayre, Welbe, Barker, with their “associates”—“co-partners,” as they are called in another clause. And, besides even this, it was wholly beyond Governor Winthrop’s power to extend this obligation of the patent to. persons other than the grantees or their heirs or assigns. He wras named as an arbitrator to fix the sum to be paid, or things to be done, by the patentees; and the determination of any other matter was wholly beyond the terms of the submission. We may yet add another suggestion bearing on the nature of this grant —the notion of the Earl of Stirling, as attested by his confirmation of the Farrett patent, viz.: that this land was to go to the survivor of the patentees, thus following the idea of a joint tenancy, or co-partnership, indicated by the main *533 instrument, and throwing some light upon the meaning of the word “ successors,” as used in the Indian deed, which was an outcome of the patent. True, this instrument (the confirmation) attests the fact that its draughtsman and the earl himself, were alike ignorant of the terms of the patent —a fact which largely detracts from the force of this suggestion. But it, nevertheless, has some bearing.
We may now pass to consider other facts in the history of this title during the ensuing quarter of a century which preceded the Andros patent. On June 11, 1647, it was resolved “ by all the inhabitants * * * that this town is to be divided into fortie house lots, some bigger, some less, as men have put in a share,” etc. Of course it may be said that this, purported to be the act of the “inhabitants,” and we thus early meet one of the difficulties in tracing the distinctions which we have noted, arising, as I think, from the limited use of terms. But whatever may have been the reason for the confusion in this instance, the central and controlling fact is recognized, that the division is not among mere inhabitants, but among those only who had in fact been admitted and had put in a share. Without going into details it may be generally stated that these original undertakers and others whom they admitted with them, did divide up the territory covered by the Farrett patent and Indian deed in general observance of the aforesaid early plan; and it was, from time to time, allotted or part of it sold, the authority in all cases proceeding from the “freeholders ” or “ freemen ” as they were called. Various acts for the government of the people, the selection of officers, etc., were adopted at what were called ‘ ‘ town meetings. ” Sometimes they referred to their organization as a colony of Southampton. But, as before observed, the source of authority in no instance can be traced to a meeting in which a mere inhabitant, in'the broad sense of the term, ever participated; and although there were several allotments of land, we find no instance of an allotment to any person who did not stand in the position of a shareholder or member of the “ company ” as originally constituted or as modified by the admission of new members. At the meeting of June 19, 1657, it was “voted and concluded by all the inhabitants of the town, that they will unanimously stand to maintaine and defend all their lawful rights that they have in possession by purchase and patent right from Mr. Farrett, as agent of the Earle of Stirling, or purchased from the Indians.” The evidence does not disclose the occasion for this resolve. But it doubtless arose out of some of the conflicting claims, either of military leaders who claimed control of the colony, or "from the Indians who afterwards, at various times from November 24, 1686, to 1703, confirmed *534 their original grant, and the title of individuals acquired thereunder.
We may now more intelligently pass to the history of the Andros and Dongan patents. The reign of Charles I ceased in January, 1649. He was succeeded by his son, Charles H, who assumed the title of Mng immediately on the death of his father, but was not crowned until January, 1651. He was not generally recognized as king until May, 1659, after the death of Cromwell in 1658, and the downfall of the government of his son Richard. On the 12th of March, 1664, Charles II issued his royal charter to his brother James, duke of York and Albany. This instrument contains what purports to be a grant of land including Long Island, and delegates power and authority of government. In August of the same year Colonel Nicolls, afterwards governor, under the duke of York, obtained the surrender of New Amsterdam (New York), and it, with parts of New England, came under his control. Precisely how far these freeholders or proprietors acknowledged the claims of the duke of York to their lands, prior to the Andros patent, is not entirely certain. But it is certain that the evidence in this case discloses no recognition of a superior right to this land, unless it be found in the Andros or Dongan patents— a point which we shall presently examine. It is difficult to discover any good reason to suppose that he had any just claim to the land, inasmuch as his right was through his ancestor, James I, who granted it to the New England Company in 1604, and it had granted it to the earl of Stirling. (Supra.) More than this there is historical authority for the statement that the descendant of the earl (Henry, fourth earl of Stirling), made a grant to the duke of York. See Stirling memoirs in Long Island Historical Society Library (supra). This was probably the fact, otherwise we are puzzled to find so few titles coming through the earl of Stirling. But the case does not depend upon any such speculations. We have seen that the Farrett patent did not delegate governmental power. Hence Stirling’s grantees might well have recognized the duke’s right of civil government, and reasonably have sought some definite chartered rights for their town, proceeding from him as the source of royal power. It is certain that they never had any such chartered rights until the Andros patent. It is said, however, that they were recognized as a town by the duke’s governor, Richard Nicolls, October 3, 1666. The facts touching this event appear in evidence. Certain Indians had made a grant to Lion Gardiner, prior to March 10, 1664, and one to Captain Topping, April 10, 1662, affecting these lands; Gardiner assigned his rights to John Cooper, one of the undertakers, who accepted the same, *535 December 23, 1658. These men, Cooper and Topping, were •among the freeholders of Southampton, and naturally a dispute arose between them and the other freeholders, properly called “Southampton men,” about their right to hold adversely under these Indian grants.
This dispute was submitted to and decided by Governor Mcolls October 3, 1666. His written determination, bearing that date, recites the fact that John Howell and Henry Pierson had been deputed by the town to prosecute its side of the dispute before him, and his determination was that Cooper and Topping must acknowledge the superior rights of the town. It is not pretended that it was yet a body politic or corporate in law, and even if it was there was yet no grant to it as such a body, either by the freeholders or by the Duke of York, or anyone holding or claiming a title ■superior to that of the freeholders or proprietors except those two men. And it is apparent on the mere statement of the case, that they having been admitted as freeholders, and being thus bound by the obligations of the original undertakers’ scheme, could not hold as against their associates. The doctrine of estoppel would prevent it. There is nothing in tlfe writing signed by Governor Mcolls which shows that the question of corporate capacity of the town was raised, submitted to or decided by him. The entire argument rests upon his use of the word “town,” and that is certainly not necessarily inconsistent with the- idea that the mere business association of freeholders constituted all there was of the town. The freeholders had often spoken of themselves, and even of their “ house lots,” in that way, while they were yet plainly adhering to the theory or private ownership, and it was, therefore, natural to use this term without reference to technical force, especially, as already observed, in a proceeding in which that question was not necessarily in issue, or even important one way or the other.
It is claimed, however, that there is force in the duke’s laws to repel the inferences which might otherwise be drawn from the facts to which I have referred. These were established by authority of the charter of the Duke of York, and are said to have been adopted “at a general meeting at Hempsted ” March 1, 1664. These laws do certainly refer to the existence of towns, their officers, government, etc. But there is no special mention of this town of Southampton, nor have we been furnished with any rule by which it may be definitely determined that such voluntary associations as this one was, were regarded as bodies corporate or politic. And the evidence in this case shows that the “ inhabitants ” of Southold (a term which clearly referred to freeholders, since it related to their lands), dis *536 tinctly made the point to Governor Andros that these “lawes” did not apply to such “plantations” as theirs were. So, too, authentic history shows that the freeholders of Southampton took a similar position February 15, 1670. The text of their memorial clearly shows this fact. See Stirling Memoirs and Documents, supra, * * * page 77.
The result of this protest by the Southolders was an order of the general court of assizes, • held at New York, October 4-7, 1676, that they had forfeited their titles, and that unless they brought in their grants and took out patents, execution to enforce the forfeiture should issue. My researches have failed to disclose a similar order against the Southampton freeholders; but the fact that their patent under Andros is dated within thirty days of this order, is suggestive of the fact that they profited by this precedent. But there are provisions in these “lawes” which are of great significance bearing on these titles. One is as follows : “To the end that all former purchases may be ascertained to the present possessor or right owner, they shall bring in their former grants and take out new patents for the same, from the present governor in behalf of his royal highness the Duke of Yorke.” It is not pretended that these Southampton freeholders obeyed this requirement, except after their memorial to Governor Andros.
Another provision was this: “No purchase of lands from the Indians, after the first day of March, 1664, shall be esteemed a good title without leave first had and obtained from the Governour.” Another is this: “ Whereas, it is said that all grants and patients are to be brought in and renewed, etc., its bee understood that all old grants which are brought in are to be confirmed and returned to the parties.” Certainly this does not look like a rule requiring a surrender of title under old grants to either the duke or his-governor.
This was followed by the memorial from the “inhabitants” of Southold and the freeholders of Southampton to-Governor Andros, distinctly setting up their title under the Earl of Stirling’s grant. There was a distinct protest against taking a new grant of land for fear of the implication which might arise against their title under the former grant. Suffice it to say that Sir Edmond Andros, then governor under the Duke of York, issued what is known as the Andros patent, November 8, 1676. As I understand the opinion of the learned trial judge, he holds that this and the patent issued by Governor Dongan, ten years later, control these titles. Let us, therefore, examine this point with care. We have seen, first, that, under the Duke’s laws, the object of bringing in former grants was that “all *537 former purchases may be ascertained to the present pas-. sessor or right owner;” second, that purchases from the Indians after March 1, 1664, without royal consent, would not be recognized. Here was a plain implication that all purchases made before that date would be recognized, and confirmed if the purchasers were “ascertained” to be the “ right owners.” We have also noted that the old grants which were brought in should be confirmed.
Now, this Andros patent, after describing the premises, which undoubtedly include Mecox Bay, proceeds to define the object of the instrument in these words: “Now, for a confirmation unto the present freeholders, inhabitants of said towne and precincts, know ye,” etc. Observe, that this confirmation was not to the town, as a body corporate, but to those of its inhabitants who were actual freeholders of land in the territory. True, like words are used in the clause which grants “ the privilege and immunities belonging to a towne within this government.” But it should not be forgotten that the object of this charter, both under the duke’s laws and the patent itself, was to confirm former grants of land to the present freeholders to make an. additional grant of another sort of right altogether, i. e... coroporate franchises, for certainly there has been no prior grant of any such corporate powers. Indeed, under the existing “laws,” there was no authority to do anything else. The grant of land, so far as it may be treated as passing any title at all, is to individuals, in behalf of themselves and their associates, as freeholders. It also gave permission to perfect possible defects in title by purchases from the Indians.
Of course we here, again, run against the same point which we noted under the Barrett patent arising on the unnamed “ associates.” But there is this, at least, to be said: The patent was issued on the application of the present freeholders to confirm, etc. So that we have another element of estoppel to restrain the assertion of any outstanding interest.
Now, it may well be that the former grants were not broad enough to include the waters or the lands under the waters of this Mecox Bay—a point which we shall examine later. If they were broad enough, it is plain to my mind that this patent did not operate to convey any land at all,, because there was nothing left to grant, but simply to confirm in the persons who “then were freeholders,” all the rights which they then owned as freeholders, both in the lots which they held in severalty under their allotments, and as tenants in common in the commons. In other words, it *538 ■confirmed the existing status, whatever that was, so tar as it related to real property.
If there was any real estate within that territory which was not already vested in the freeholders, it unquestionably passed under this grant, or to those named, subject to a trust for all the others, and, as I think, it passed to these patentees as individuals. It can scarcely be said that unnamed associates took no title because of the indefiniteness of the grant in this respect. For the so-called town records showed just what they were, and the lists of freeholders are not infrequent among the “London Documents” (supra). The corporate powers passed also to them, but the corporate body was not to be known by the name of the “freeholders and inhabitants of the town of Southamption.” On the contrary, the corporate name was “ Southampton, by which name and stile it shall be distinguished and known.” The habendum clause of this instrument is worthy of note in this:
1. It clearly separates that which purports to be a confirmatory grant of lands from the grant of the corporate franchise, thus apparently distinguishing the nature of the two acts.
2. It- is certainly appropriate to a grant to individuals, i e., it is to “their heirs, successors and assigns forever.” True, the word “ successors ” is ordinarily applied to corporate official functions and rights; but, as already noted respecting the Indian deed, it ought not to be construed to ■defeat individual rights, for the “Laws’’under which it was issued were assigned to save and confirm them.
'3. And it is plain that it was not intended to have that effect in this instrument, because the habendum clause contains a distinct proviso that the grant shall “in no way prejudice or infringe the particular property of any person or persons who have right by patent or other lawful clayme to any parcel of land or tenements within the Emits aforesaid.” What patent could this clause have referred to save the Farrett patent ?
We thus obtain a clear view of the situation. Here were “ Laws ” designed for the confirmation of grants; but a public duty was, nevertheless, imposed, for reasons of public policy, requiring official examination of titles, to the end that the rights of the crown and of the freeholders might be “ascertained” and declared by new patents. The only conceivable object of this pohcy was two-fold: First, to settle public and private rights, and enforce allegiance, not to the new government, but to a new administration. And so it would seem that every trace of a new grant of land, as distinguished from the corporate francises to the town, disappears.
*539 It will not be amiss to note the fact that there were towns having a corporate existence when these “ Laws were passed, and the bringing in of “former grants ” thereby required, did not apply to towns, except so far as they were “the present possessors or owners.” Nor do I find anything which necessarily recognizes the corporate capacity of Southampton in the recitals of the Andros patent. True, it says: “ Whereas there is a certain towne in the East Biding of Yorkshire upon Long Island, commonly called and knowne by the name of Southampton.” But the term “town” may have been used for mere convenience as an aid to the description of lands. At all events, his act in speaking of it as a town did not make it a corporate body, and it is perfectly plain that he did not intend to grant any thing by this clause, much less franchises to an existing •corporation, for the reason that he afterwards grants such a franchise.
We come then to the Dongan patent, ten years later— December 6, 1686. By this time Charles II was dead. He -died February 6, 1685, and James, his brother, the duke of York, was king under title of James II (seventh of Scotland). Dongan was commissioned governor by James II, June 10, 1686, having held a former commission from the same person while he was yet duke of York, September •30, 1682. This document, issued under the direct authority of King James II: First, fully recites the Andros patent; and, secondly, that a difference had arisen between the inhabitants of the town and the Indians respecting the bounds of the town, and concerning the sufficiency of the language of the instrument to constitute a grant of corporate privileges and immunities; thirdly, that Major John Howell, a freeholder and one of the Andros patentees, by order of the freeholders (not of the town for it, now since the Andros patent, certainly was entitled to be called by its corporate name—“South Hampton,”—if Howell’s authority came from the corporate body), had applied to him to confirm the lands to the freeholders, not to any corporate body,—in a more full and ample manner, and to determine the differences between them and the Indians, and to “erect’’the said town of Southampton into one township. It then proceeds to state "that he has determined that the freeholders—not the town by Governor Andros’ name “Southampton,”—have purchased the Indian rights, and that the title to all the land is in the freeholders, not in “South Hampton,” the corporate name authorized by Governor Andros. He then grants, ratifies, releases and confirms the lands to individual freeholders and afterwards grants to them the corporate franchises of a town to be known by a new name, viz.: “ Trustees of the freeholders *540 and commonalty of the town of Southamton ” etc. This grant is-still to individuals, who are described as “freeholders and inhabitants of Southampton” (note this use of Governor Andros’s corporate name) 1 ‘ hereafter erected and made one body “corporate,” etc.; “and their successors,” etc.
It is true that the habendum clause of this grant is somewhat confusing. After again reciting the individual names of the patentees, it adds, “freeholders and commonalty of the towne of Southamton.” But, however, strongly it may be urged that the word “commonalty” tends to show that the “ habendum ” ran to the existing corporation established by that charter, there is this to be said, viz.: That that certainly was not the corporate name which Governor Dongan himself authorized, i. e.: “ The trustees of the freeholders and commonalty,” etc.
It then states that the grant is for “the several and respective uses following and no other, i. e. (1), the lands taken up and appropriated by the several and respective present inhabitants to the only use of their several and respective heirs and assigns forever; (2) as to those “not yet taken up by any particular person or persons “to the use of such persons as have been purchasers thereof and their heirs and forever, in proportion to their several and respective purchases thereof made, as tenants in common.” Mow, let us, for the moment, put out of view the considerations which arise on the Barrett patent, the Indian deeds and Andros patent, as vesting these titles in individuals, and assume that the crown yet owned some interest or estate in these lands and waters on which this so-called Dongan grant of land could operate.
Let us go further and assume that this Dongan patent ran to the corporate body—“the trustees of the freeholders and commonalty of the town of Southampton” —and see where we shall bring up. Even in this view the grant was to the use and benefit of “the present freeholders and inhabitants.” Surely this designation is not indefinite in the same sense in which the grant in Jadc-_ son v. Sisson was indefinite. We are no longer dealing with the vague term “associates,” but with a definite party of individuals whose names were almost as well known to the crown in London through their “lists of freemen,” found even among the “London archives,” as they were on the town books at Southampton. More than that, they were susceptible of definite ascertainment, by a definite test, viz.: They were the individuals, severally and respectively, who then had “taken up” the lands, not only those which had been partitioned, but those not yet taken up. This grant (if we treat it as operative as a *541 grant) was, if you please, to the corporate body for the use and benefit of the present freeholders, the allotted or partitioned lands in severalty and the undivided lands “as tenants in common.” So that there was a valid conveyance to uses. And, even, if by reason of its supposed indefiniteness, it was not valid to uses, a trust arose, not by implication or construction, but under the express terms of this written instrument, in the partitioned lands for each occupant of his allotment, and in proportion to their several and respective purchases in the commons. Here, then, on this hypothesis, was a naked legal estate in the corporate body, which was either to the use of, or in trust for, with the entire equitable estate in, these individuals, in definite parts or shares.
How, it cannot be doubted that their subsequent dealings among themselves constituted valid transfers of these equitable estates, because it was not necessary to observe' all the forms of a grant of a legal estate in these dealings. Fisher v. Fields, 10 Johns., 503. And so, on this hypothesis, we pass on down, dealing in purely equitable' estates, until, under the constitution of this state, all existing uses and trusts were abolished (§§45, 46, 48; 1 B. S., chap. 1, part 2, title 2, art. 2, p. 727), and the fee simple absolute fell into the individuals, severally and respectively, of their allotted and purchased lands, and, necessarily, “as tenants in common” in the undivided lands, for that was the language and intention of the use under the Dongan patent.
But I do not rest the case on these hypotheses. I think this grant ran in form to individuals, and it was utterly inoperative as a grant to affect pre-existing rights.
I find in it a clear recognition of Gov. Andros’ ratification and confirmation of the Farrett and Indian grants. Let us see. Literally construed, there is slight ground for the argument that this so-called grant of land seems to run to these individuals as members of a body and their successors, without the words heirs and assigns. And, since this grant seems to have been made on the application of the freeholders, through their agent, there is some slight, foundation for the claim that it was to the body. But it does not seem to me that that was its intention or effect. A variety of reasons, in my opinion, sustain this view. In the first place, the recitals show that there was no trouble about the title to the land. On the contrary, the trouble was (1) with the Indians respecting the boundaries of the body of land covered by the Andros patent, and (2) about the sufficiency of his language to confer corporate “privileges and immunities.” In the next place, the habendum of the Andros patent was a full and complete confirmation of the former grant by the Farrett patent, the original In • *542 dian deed, and the determination of Gov. Nicolls respecting the later Indian deeds to Gardiner and Topping, and it is, therefore, difficult to see how this instrument, made by authority of one who had already parted with all title, could operate to change a title already vested in individuals.
In the next place, assuming it had any effect on the title at all, it must operate on the whole or none, and that would throw the entire title to all the land into the corporate body, to the utter destruction of what there was of a certain legal estate in all the allotments and purchases of the preceding quarter century, a result which could not have been contemplated, and which was never regarded as accomplished. Because these old allotments and sales have been respected ever since, and are to-day the foundation of the individual holding of most of the lots in the town.
This status was afterwards ratified by the act of the colonial legislature on May 6, 1691, which confirmed all former patents, but expressly saved all individual rights. See Jones & Varick’s Laws, Vol. 2, Appendix pp. 1, 2.
We come next to consider the confusion arising from the condition of the records and subsequent enactments. They show that the secretary or recording officer rarely used the corporate name, but continued the older custom, sometimes reciting a “town meeting,” now and then a vote of the' “inhabitants,” and sometimes of the “freeholders.” But, so far as I can discover, there is no serious difficulty arising from this source for the following reasons:
In the first place, the town meetings were necessarily of the admitted freeholders for many years (supra), and their vote, whether at a corporate town meeting or at a meeting of individual freeholders, would accomplish precisely the-same result, so far as the lands and their control were concerned. In the next place the records show that, although the trustees of the town would necessarily represent the freeholders or proprietors in addition to the corporate functions of the town, a distinction was quite early drawn in the minutes between the freeholders or “proprietors ” and the corporation, i. e. “The trustees of the freeholders and commonalty,” etc.—the corporate name. The word “proprietors ” seems gradually to have crept into use as indicative of such a distinction, until, by and by, we read of a proprietor’s journal. We note these distinctions so early as February 7th, 1686, when it was “ concluded and agreed” by “general voat of the towne” that the charges about “the present patent * * * shall be paid by the proprietors according to their respective proportions, . rather an odd resolution, to be sure, if this patent was a town matter. During the year from about April 1st, 1711, to April 12th, 1712, the distinct subject of the “proprie *543 tors’ ” rights in the common lands was investigated and considered at town meeting.
In 1782-92 the division of common lands was among the “proprietors” and there was a “proprietors’ ” fund resulting from sales.” It will, of course, go without saying that if the confusion is evidence for the plaintiff, the distinction is more sufficient evidence for the defendant, because the same individuals who constituted the town corporate were-insisting upon the distinction. But we now come to something which is rather more confusing than the minutes themselves because of the dignity of the body from which it proceeds, viz: the acts of the legislature passed April 15, 1818, and April 25, 1831. It seems that, either because of the doubts which had arisen on the subject, or because of the inconvenience resulting from getting all the freeholders and proprietors together and transacting their business directly, they were authorized by the first act to hold annual meetings and elect not less than six, nor more than twelve of their number, who should be trustees of these “proprietors,” and who should “manage all the undivided lands, meadows and mill streams in the town of Southampton,” make by-laws, etc.
They were to have the same power over these lands and waters that the town as a corporate body then had, except that, so far as it related to waters, it was limited to mill, streams; and there was an express provision that the control of the fisheries, the sea-weed or any other production, of the waters of said town, should be managed by the corporation for its benefit, as it “had power to do before the passing of this act.” At first impression, this would seem to recognize the title and control in the town corporation. But it was not so. The whole of this supposed recognition of town control was limited by an express proviso “that nothing herein contained .shall in any manner affect or alter the right, title or interest of any person, or the inhabitants of said town to any of the before-mentioned premises.” Let us not forget that the word ‘£ inhabitants ” was now used in its general sense. And, to add still more to the confusion, the act of 1831 declared that the corporation, by its corporate name, under the Dongan patent, should continue a corporation, and might elect trustees who should choose a president and clerk, prescribing their duties and providing that such trustees should “ have the sole control over all the fisheries, fowling, sea-weed, waters, and the productions of the waters within the said town, not the property of individuals, together with all the property, privileges and franchises granted to them by the charter of Governor Dongan * * * except so far as are abrogated, changed and. altered by the Laws of this state * * * and not now *544 belonging to individuals, nor to the “ proprietors/ under the act of 1818. I do not see how these enactments changed the individual rights of the “proprietors ” in any respect, except to enlarge them. The act of 1818 clearly recognizes the fact that there then were “undivided lands and meadows ” in the town held by the “ proprietors,” and it seems to assume the fact that the corporation then had the right to control the same, which right was taken away. But its language is carefully guarded so that it shall not affect individual rights. Just where, when or how the corporation obtained any such assumed rights I cannot see. If they were in the individuals the final proviso left them there.
If the “proprietors” owned the land below low water mark in Mecox Bay, they certainly had the right to sell it and control the use of it—a right which the legislature had no power to take away from them; and the operation of the final proviso was to prevent the corporation from exercising any such control. Assuming the existence of such individual rights, the act authorized the selection of trustees who might sell, lease or partition such lands; and, on the authority of Brookhaven v. Strong (60 N. Y., 56), if the individuals owned these lands as tenants in common of private property, they also owned the fisheries in common as private property, which right was also saved by the final proviso. Again, the act of 1831 gives the corporation all the rights granted by the Dongan charter (except those taken away by legislation), leaving the question of what those rights were wholly undetermined. Indeed, this branch of state authority had no power to settle such a question at all, and the guarded language of the act shows that the legislature carefully abstained from any such attempt. The apparent control given over ‘ ‘ the fisheries, fowling, seaweed and productions of the waters ” is limited by the rights of individuals as they existed tinder the act of 1818, which left them precisely as they stood before. On the whole, I can see rio substantial change in the property rights of either the town or the “proprietors,” except that the latter certainly acquired the right to act in respect of their lands, meadows and mill streams, through trustees, leaving the question of title just where it stood before. Happily, however, the legislature has more clearly stated its views on this subject. Chapter 46 of the Laws of 1859, passed March 16, declared that “the fee ” of certain lands and marshes in the town of Southampton “is in the trustees of the proprietors of the common and undivided lands, * * * ana other lands are heldin the same manner;” and the state, in behalf of the Shinnecock Indians, authorized them and the trustees of the “proprietors” to *545 make exchange of lands. Then, on April twenty-first of the same year, the exchange was perfected. Whatever, therefore, remains in doubt about the effect of these noncommittal acts of 1818 and 1831, there is, at least, this to be said, viz: that they certainly point out and give the strongest possible emphasis to the fact that the “proprietors” had, all along, maintained that they were private owners of the common lands as tenants in common, and that assertion seems to be recognized by the legislature. And, if that was true of the lands, why was it not also true of all the rights which were reserved for common use under the declaration of the original “undertakers” scheme, viz: the fishing and the lands between the banks— i. e., all the lands under the waters in the town ? I confess that I am unable to deny their rights in this respect, and, unless the point has been definitely decided, shall so hold.
I, therefore, reach the question: Has this point been decided adversely to the claims of the “ proprietors ” of these Southampton lands ? My conclusion is that it was decided in their favor by the general term of this district in Rose & Jagger v. Phillips. The action was for trespass by Phillips, in justice’s court, for entering upon and taking sea-weed from a part of that which had been the common lands, but which had been conveyed by the “trustees of the proprietors,” to the plaintiffs March 21, 1861. A plea of title having been interposed, the action was removed into this court, where it was tried before Mr. Justice Sohru<4an without á jury. The defendant was beaten under this title, and the judgment was affirmed by the general term, Gilbert, J., writing the opinion. Of course, it may be said that this decision may be justified on the authority of the act of 1818, which vested the control of these commons in these trastees, even if they belonged to the town. But I do not understand the decision to rest upon this narrow ground. I have, also, carefully considered the case of Atkinson v. Bowman (supra), and it does not seem to me even to touch the point here involved. Ho case within my recollection or research has, so fully as this one, presented the details on which this title depends. The original grant in that case was from the Indians of territory of East Hampton. The case (5 N. Y. State Rep., 46), shows nothing respecting any patent from the earl of Stirling, and the printed case shows that there was no patent from that source. The title rests upon other grants by Governor Hicolls and Governor Pongan, which are totally different in most material particulars, and even those were unaided by the evidence of any such early agreements among the grantees,—a circumstance which specializes this case. The *546 first grant was by the Indians to Eaton and Hopkins in 1649, without permission from the crown. There was no grant to inhabitants generally until March 13, 1666, when Governor Nicolls, under the duke of York, chartered the town and granted its lands to certain individuals and their associates, who are described as “the freeholders and inhabitants of the said town.” Here was a corporate town authorized to take and hold lands, a fact not existing in this case at the time of the Farrett patent,—and there had. yet been no grant of land to individuals under royal authority, as in the Case of Farrett’s Patent. The habendum clause of this Nicoll’s patent contains no reservation of individual rights under a previous patent under a royal grant or from the Indians,—another circumstance which, to my mind, specializes the Farrett patent.
There was no patent by Andros in evidence, although Nicolls’ was very like it in other respects. The patent by Dongan was Deeember9,1686, and was totally different from that to Southampton freeholders. The organized town had discovered defects in its title, not mere disputes about boundaries , and desired a fresh royal consent to purchase from the Indians, in order to avoid the possible prohibition under the Duke’s laws (notwithstanding Nicolls’ permission), that all such dealings after March 1, 1664, would not be recognized. A similar distinction will be found in the more recent case of Hempstead v. Thompson, in this district, February, 1887 (8 N. Y. State Rep., 901). There the original patent was under the Dutch, by Gov. William Kieft, November 16, 1664. It erected the town and made it a body corporate and politic, at the same time with the grant of lands, so that there was a corporate body to take which was not the case at the time of this Farrett patent. Besides that, all the Indian grants were subsequent to this, erection of the town corporate.
It may be remarked, generally, that a clear distinction will be found between this case and all the more recent cases affecting these Long Island lands held under these early charters. In none of the first patents under the Duka of York-is there any reference to any prior patent. Their “franchises” generally recite mere possession and improvement of the land, while here the habendum of Andros refers, to a patent, and the preamble even of the Dongan charter recites the disputes with the Indians about boundaries and the doubt about the sufficiency of .the language of the Andros patent to create a body politic as the sole occasion for the act; and the Andros patent distinctly preserves the individual rights theretofore acquired; and, finally, even Dongan’s patent shows that the object of what purports to be the grant of lands was to create an estate in the individuals. *547 “severally and respectively ” in severalty for these alloted lands, and to make them “tenants in common” of the undivided lands. We find nothing like this among the charters which appear by the printed appeal papers in either of the foregoing or following cases, where the right to control the fisheries and land under water has been held to belong to the towns. Brookhaven v. Strong, 60 N. Y., 56; Robins v. Ackerly, 91 id., 98; Hand v. Newton, 92 id., 88. And in all, we find that the corporate town was erected by the same instrument which constituted the first royal grant, so that there was some legal body other than the individual grantees in whom an estate could vest. Doubtless the two cases present many features similar to this one; but my study of the facts in this case has resulted in so clear a conviction of the private nature of these original purchases, and their confirmation as private purchases under the authority of the Duke of York through the Andros patent, and this is fortified by almost unbroken record of the distinction between the “proprietors” rights and the rights of this town corporation, that I am unable to accept any other view than that which I have indicated.
We return then to the inquiry: Did the estate in the lands under the waters of this Mecox bay, pass under the Farrett patent or any of the Indian deeds ? I think they did. The Farrett grant is certainly broad enough to cover them, especially so if we Regard the first Indian deed as referring to the same lands. It covers the harbors, rivers and creeks within the territory. It reserves no right affecting the realty save that of trading with the Indians, within its bounds. Expressio unius, etc. The Indian deed covers “all the lands, woods, waters, water-courses, etc. If this Mecox bay was a a part of the tide water, why was it not a harbor within the meaning of the Farrett patent ? If it was not a settled part of the tide water of the Ocean, by reason of the fact that its outlet was stopped by natural deposits of sand for a great part of each year, why was it not a water-course when open ? It certainly was within the town “waters,” in any view. Besides that, the surrounding or adjacent land certainly did pass, together with the land under the water. Then, if we regard the original record of the “undertakers” on March 10, 1639, as an agreement, its terms would seem to define these original purchases: and, under them, we find that the right of fishing, etc., was to be free, not to the public, but to the allot-tees, their heirs and assigns, which practically threw the streams and waters and their beds into the commons, but not for public use. If I am right in these views, these water rights passed to the control and ownership of the *548 “ freeholders,” and the terms of the Andros patent covers “fishing, hawking, hunting and fowling,”if any such right remained outstanding. Besides this, we find that these freeholders afterwards came to be called “proprietors,” long prior to the Act of 1818 and did claim and exercise the right to control the waters and lands under the waters of this bay at intervals for nearly a century. And again, even if we regard the Dongan patent as operative, as a grant of lands, its provisions, together with the abolition of uses and trusts, would lead to the same results, for its terms unquestionably cover every conceivable right involved in this case.
It only remains to add that the defendants claim under “ the proprietors ” and it is not disputed that their title is perfect if the “proprietor” held title. I think the town corporation has failed to show any title or right to control the locus in quo.
These views lead to a reversal of the judgment, and an award of a' new trial, which is accordingly directed, with costs of this appeal to the defendant, to abide the event.