[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 58 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 59 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 60 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 61 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 62 
This action involves the title of the plaintiffs to a portion of the Great South bay at Fire island, and the exclusive right to the oyster fisheries therein. Their title originated in two patents to the town; one in 1666, by Governor Nicoll, and the other by Governor Dongan, in 1686, and a third patent, in 1693, by Governor Fletcher, to William Smith, the ancestor of one of the plaintiffs. We are asked to hold that, assuming that these patents covered the bay and, in terms, granted the exclusive right of fishery, *Page 64 
yet, that they conveyed no title, for want of power in the king to make such grants; and it is claimed that fishing in navigable waters is one of those common rights which belong to the whole people, and which the crown could not, since Magna Charta,
restrict.
The rights of fishery in navigable waters and the power of the crown over them, have occasioned great controversy and litigation in England, and to a limited extent in this country. The nature of the restraint imposed by Magna Charta, the extent of its application, and whether operative or not at the time these patents were granted, are questions concerning which neither elementary writers nor the courts have very clearly determined or established. Blackstone intimates that the restraints of MagnaCharta were intended to apply only to free fisheries, and says that the distinction between a free and several fishery is, that the latter is connected with the ownership of the soil while the former is not, and suggests that this distinction may remove some of the difficulties in respect to this matter with which the books are embarrassed, and adds, "for it must be acknowledged that the right and distinction of the three species of fishery are very much confounded in our law books." (Bl. Com., 39.) Other authorities repudiate this distinction and give other definitions to the different kinds of fishery. Mr. Schultes, in his treatise on aquatic rights, elaborately reviews the question, referring to all the English authorities, and maintains that a free fishery is not exclusive but is the same as a common fishery, and that a several fishery although exclusive, is not necessarily connected with the ownership of the soil. (Page 32.) Woolrych, on the other hand, says that he endeavored to treat the two species of fishery, common and free, as the same, but declares that, "there is no modern decision which can warrant us in uniting them, however reasonable the junction might be." (Woolrych on Waters, 137.) Chancellor KENT says: "The more easy and intelligible arrangement of the subject would seem to be to divide the right of fishing into a right common to *Page 65 
all, and a right vested exclusively in one or a few individuals." (3 Kent's Com., 411.) The difficulty is in determining when it is exclusive and when common. The principle that the ownership of the soil is material in determining that question, comports with our legislative action and ideas of such rights. "On the principle of ownership of the soil it is that the owners of land bordering on fresh water rivers have the right of exclusive or several fishery therein in front of their lands." (Angell on Tide Waters, 105.) The rule of ownership bordering on navigable waters, that is where the tide ebbs and flows, is different. The title of the adjoining owner extends only to high-water mark; but if the title to the soil under water is obtained, there is no reason why the same right of fishery would not attach as to fresh waters, subject of course to the superior public right of navigation. This principle was recognized in Palmer v. Hicks
(6 J.R., 133), which was an action to enforce a penalty for raking clams in the sound contrary to a regulation of the town of Flushing. The court said: "The town of Flushing must show a right of property to the lands below low-water mark in the bay on the sound, in order to entitle them to make rules to regulate the use of those lands." This principle tends to support the doctrine intimated by Blackstone, that Magna Charta was only intended to restrain the king from granting exclusive rights of fishery, disconnected with any right of soil or in disregard of the rights of the owner of the soil; and this seems to be the view heretofore entertained by the courts of this State. In Gould v.James (6 Cowen, 369), it was held that a several fishery in an arm of the sea, may be derived from a grant or prescription, and that such was the settled law of England. In Rogers v. Jones
(1 Wend., 237), the power of the king to grant lands under navigable waters, with the exclusive right of fishery, was expressly adjudicated, and it was there held that Magna Charta
did not prohibit the power, but was intended only to prevent the king from putting any rivers in defenso for his own recreation, except such as had been in defenso in the time of Henry II; and though *Page 66 
restricted as to the occupancy of rivers, for his pleasure, he was at liberty to grant the land under such waters. The same doctrine was recognized in 26 Wendell, 414, by VERPLANCK, senator. According to the common law, "the king is the universal lord and original proprietor of all the lands in his kingdom, and that no man doth or can possess any part of it but what has, mediately or immediately, been derived as a gift from him, to be held upon feudal services" (2 Bl. Com., 52); and this right extends over all lands, as well such as are covered with water as such as are not.
The opposite view is that the king holds the title to the soil covered by navigable waters and to the water itself as a representative of and trustee for the people of the realm, and that the assumption of a right to make exclusive grants was a usurpation which was prohibited by Magna Charta, and there are many expressions in the elementary works, and some decisions, to favor this view. A very able discussion of the question by counsel is contained in the case of Martin v. Waddell (16 Peters, 367). The case, however, was decided upon another point. A majority of the court expressed a doubt whether the power existed but declined to consider it, while the dissenting opinion assumed its existence. After a careful examination of the able and elaborate arguments on the part of the appellant, in view of the fact that the question has practically lost its importance in this country, and of the weight of authority in this State, we are inclined to adhere to the decision in Rogers v. Jones
(supra), without entering into a discussion of the merits, involving, as they do, the consideration of confused and antiquated customs, obsolete terms and distinctions, and conflicting opinions. That decision was made nearly half a century ago, and the plaintiffs, and perhaps others, have since possessed and enjoyed rights of property under the protection of its authority, and it would require a much plainer demonstration than can be made of the point involved, to justify this court in overruling it. But, regarding the correctness of the decision as doubtful, the subsequent ratification of and acquiescence in these *Page 67 
grants and the rights claimed under them by the legislative power, together with the long use of the property, very much strengthens the title of the plaintiffs and should legitimately have a material influence in reaching the same result.
It is not disputed that the right of fishing in navigable rivers and arms of the sea is presumptively free and common to all the people, but that such right may become exclusive in the owner of the adjacent soil by grant or prescription subject to the superior public right to use them for all navigable purposes, and assuming a technical defect of power in the king imposed by the restraints of Magna Charta or otherwise, that the authority of the legislative power represented in England by Parliament is ample to make such grants. (Angell on Tide Waters, 107.) This power was exercised in local matters by the governor and colonial assemblies before the Revolution, and these grants, among others, were expressly ratified and confirmed.
By the act of the legislative assembly of the colony of New York, referred to on the argument, passed in 1691, for the purpose, among other things as stated in the recital, of quieting titles, all charters theretofore granted to cities, municipalities and others, with all royalties and other franchises, are confirmed in very broad terms. The same assembly also passed an act annulling several grants of land made by former colonial authorities as excessive in extent or value, without even making any compensation for the expenses which many of the patentees must have incurred. By the entries in the office of the colonial secretary these patents were directed to be "obliterated, razed, defaced, and the memory of them reduced into oblivion and forgetfulness," thus going far beyond the celebrated "expunging or black lines" resolution of a much later day. If the colonial assembly had the power to pass the confirmatory statute referred to it virtually disposes of the controversy. We must therefore glance somewhat at the constitution and powers of that body. In Dr. O'Callaghan's historical introduction to the journals of the legislative council of the colony of New York, published *Page 68 
in 1861 by order of the senate, there is an interesting statement of the growth of a representative form of government in our State. The feeling against the arbitrary system which had prevailed in the early history of the colony manifested itself as early as 1653, and continued to do so from time to time, especially, it would seem, on Long Island, until the first colonial assembly met under Governor Dongan, in 1683. The election of the members of this assembly by the people was had with the sanction of the Duke of York, then proprietor of the colony, under writs for that purpose directed to the sheriffs of the several counties. All the formalities were observed which seemed proper for the purpose of obtaining a fair expression of the will of the people, and we see no reason why, according to well settled principles of representative government, we should not consider the assembly as having been fairly chosen and properly organized. The journals of both the council and the assembly are lost, but the laws passed remain in manuscript in the office of the secretary of State. These legislative assemblies, held from time to time for several years, were suspended during the administration of Governor Andross, resumed under Leisler's authority, and the right of the people to representation again fully acknowledged in 1691 by the commission to Governor Slaughter. The second statute passed by the assembly of 1691 (see Bradford's Laws), after referring to the authority of the governor to call general assemblies, declared that the "supreme legislative power and authority" under their majesties resided in a governor, "and the people by their representatives met and convened in general assembly." This act also contained an elaborate bill of rights and recognized a government on sound constitutional principles. The assembly exercised the highest functions of legislation by the act annulling the grants to Dellius and others, and by subsequently passing the confirmatory statute before referred to. The precise right involved, as now claimed by the town, of exclusive control of the oyster fisheries of the bay, was challenged before the provincial assembly of 1774 by a petition *Page 69 
of one hundred citizens residing in the city of New York, for relief against the fees and charges exacted by the town, of persons desiring to take oysters. Whereupon the secretary of the colony was requested to produce the patents to the town and to Smith, after which the record states that the patents were severally read and on motion the petition was dismissed by a vote of eighteen to four. The criticism that the motion was made by a member alleged to have been a neighbor and kinsman of Smith, the patentee, does not detract from the force of this legislative recognition. At most it furnishes only a slight indication that official favoritism is not exclusively a modern invention. It is argued that if the king could not make the grants directly, he could not confer the power of making them upon legislative bodies organized under charters granted by him. This rule does not apply. The charters were presumably granted with the consent or by the authority of parliament, and besides were intended to confer power to organize governments, and are not to be construed as grants for private purposes. This point is satisfactorily answered by Mr. Angell in his work on tide waters. He says: "But inasmuch as the king by virtue of his prerogative was authorized to create political power in this as in all countries newly discovered and possessed by his subjects, the colonies on receiving the royal charters were invested with a political character by which they succeeded to all the territorial interests which had previously belonged to the sovereign power of the parent country. These charters, it is to be observed, were in the nature of grants and conferred by the king on the idea that he was proprietor. But as they respectively created governments, they were not construed as other grants were, that is as not excluding arms of the sea, etc., but as including them. And thus the governments of the several colonies had ample authority to alter the established law with regard to their tide waters, or to grant an exclusive property therein at their discretion." (Page 37.)
By the commission to Governor Slaughter the statutes and ordinances passed by the colonial authorities were to be *Page 70 
transmitted within three months to the home government for approbation or disallowance, but they were valid until disallowed. (3 Col. His., 623.) Practically, for all local purposes the colonial authorities represented the power of king and Parliament. Judge STORY says: "For all the purposes of domestic and internal regulation the colonial legislatures deemed themselves possessed of entire and exclusive authority." (Story on Const., § 168.) And Mr. Broadhead, in his history of New York, recognizes these functions, although by comparison in disparaging terms. He says: "In their mimic sphere these provincial authorities faintly shadowed the king, lords and commons of England. Yet supreme above miniature colonial legislation soared the undefined prerogative of the crown of England, and the imperial arrogance of his Parliament." These views are not affected by the subsequent contest between the colonies and the Parliament of England upon the claim of the latter to the right to legislate in all cases directly for the colonies, and which culminated in the Revolution. Whether the power exercised by the colonial authorities was necessarily limited to such as had been conferred, or existed to any extent by inherent sovereign right, is of no importance upon this question. It is sufficient that the power was exercised by the express or implied authority and assent of the home government, and I see no reason, in the absence of repeal or dissent, why the action of the provincial authorities, including governor, council and assembly, upon this question, should not be regarded as valid and effective as if taken by Parliament itself, and such action may have been induced to remove the very defect now alleged to exist.
The acts of the colonial legislatures were expressly validated and continued by the respective Constitutions of 1777, 1821, and 1846, and the State government, so far as appears, has never, since its organization, interfered with rights claimed by the town, but has pursued the practice to the present time of granting lands under navigable waters to adjacent owners, for various beneficial purposes. *Page 71 
These elements of title are very much strengthened by possession and user during the long period which has since elapsed. Record evidence was produced on the trial, tending to show that the town exercised control over these oyster fisheries as early as about the year 1750, and from that period to the present time has claimed, asserted, and substantially enjoyed the exclusive right thereto. The defendant put in some evidence with the view of showing that the right had been disputed and resisted from time to time. Without referring to it in detail, it can only be claimed to establish that dissatisfaction was evinced, and a show of resistance made to the claim of the town for exclusive control; but it appears that in all cases of contest the right of the town was maintained, and has been continuously exercised in various ways, by exacting payment for individual privileges, or by leasing the land, or otherwise. It is not necessary, in order to claim the benefit of the user, that every person in the community should acknowledge the right. It may be disputed, or even denied, as it was by the oyster men in 1774, and as it has been since by individuals, but this is of no moment, provided the claimants always vindicated their right whenever an effort was made to dislodge them. Their possession was sufficiently peaceable if it was maintained without force, and by the ordinary remedies which the law afforded. This long user and occupancy, though probably not a technical bar under the statute of limitations, on account of the nature of the property and the necessarily imperfect character of the possession, are sufficient to give the plaintiffs the benefit of any presumption which may be legitimately indulged to supply defects, if not a title by prescription. (2 Greenl. on Ev., 178; Best on Presumption, 107, 145; Van Dyck v. Van Beuren, 1 Caines, 83, and note; Angell on Tide Waters, 91, 92.)
The objection that the general language of the patents should not be construed to include an exclusive right cannot be maintained. In the first place, the land under water is included within the boundaries of the grant. The rule is, that "when a patent or grant conveys a tract of land by *Page 72 
metes and bounds the land under water, as well as other land, will pass if the land under water lies within the bounds of the grant" (Rogers v. Jones, supra); and, as we have seen, the title of land under water confers the right of a several fishery. Besides, the language of the patents, "all rivers, waters, beaches, creeks, harbors, fishing," and all other "franchises to said tracts appertaining," is significant of an intention to convey this very right. There is no reason why these terms should not be construed according to their ordinary meaning, especially when applied to the land under water included within the boundaries.
Again, the usage of the parties is important in construing the terms of an ancient grant, and, in addition to the facts before stated in respect to such usage, it is pertinent, in this connection, to notice the fact that, prior to 1767, a controversy existed between the town of Brookhaven and William Smith, whose patent covered a portion of the same territory, including the bay, in respect to the control of these fisheries, which was compromised in that year by an agreement to hold the same in common, and conveyances were executed to carry out the arrangement under which they have since been managed; thus showing how two contesting patentees construed the patents considerably more than a century ago, and that the property has been since used in accordance with such construction. In Chad
v. Tilsed (2 Brod. Bing., 403), DALLAS, C.J., laid down the rule, "that when a grant of remote antiquity contains general words the best exposition of such a grant is long usage under it."
Nor can the objection that the bay was not included in the grant be sustained. The general southern boundary is the ocean, which includes the beach, and of course the bay, and the only uncertainty arises from the difficulty of clearly ascertaining that portion of the territory then occupied by the Indians, which was reserved. Intermediate the two patents, the town obtained from certain Indians a conveyance of the entire beach, and its title to other portions, if doubtful, by reason of the occupancy *Page 73 
of Indians, is supplemented by the title under the patent to William Smith, which, as I infer, covered the bay.
It is also worthy of mention, upon this point, that the legislature of the State, by an act defining the boundaries of the town of Islip, recognized, by implication, the title of Brookhaven to the bay or a portion of it, under its patent, by the following exception: "Excepting, nevertheless, all the beach and bay which is included in the patent of the town of Brookhaven, and belongs to the town of Brookhaven." (Laws of 1813, vol. 2, p. 46.) For these reasons, we think that the title of the town to the rights claimed by it is too firmly established and has been too long enjoyed to justify us in disturbing it. It should be observed that the right to control the fishing for floating fish is not involved in this action, and is not considered. The regulations adopted for controlling the oyster beds are not before us, and are not, as I infer, complained of as unreasonable or oppressive; and the plaintiffs insist that the public interests are better subserved than they would be if the beds were thrown open to competition.
However this may be, there is no legal reason for disturbing the judgment, and it must, therefore, be affirmed.
All concur.
Judgment affirmed.