ALIDA A. BLISS, Respondent, *v.* CHARLES W. BENEDICT and Others, Respondents, Impleaded with THE CITY OF NEW YORK, Appellant.

First Department, July 14, 1922.

**Boundaries — patent from Governor Nicolls conveying land bounded " by the Sound or East River " construed — East river does not include shallow bay opening therein formed by Pugsley's creek and Westchester creek — shore line of East river is line between headlands at mouth of bay — patent included land under waters of bay.**

A patent from Governor Nicolls, dated February 15, 1667, granting certain lands bordering on Long Island sound or the East river, which uses the words, " Southward they are bounded by ye Sound or East Ryver   *   *   *   Togethr wth all ye   *   *   *   Ryvers Creeks Harbours   *   *   *   within ye said bounds & lymitts," included the land lying under water in an extremely shallow bay or indentation opening into the East river, formed by the junction of Pugsley's creek and Westchester creek and lying behind the headlands known as Clason point and Old Ferry point, as the shore line of the East river at that place must be considered to be a straight line between the two headlands; hence, title to said land is in the city of New York, the successor in interest under said patent, and a grant of the same from the State of New York, dated March 10, 1917, is invalid as the State had no title to convey.

SMITH and PAGE, JJ., dissent, with opinion.

APPEAL by the defendant, The City of New York, from an interlocutory judgment of the Supreme Court in favor of the plaintiff and certain of the defendants, entered in the office of the clerk of the county of Bronx on the 8th day of March, 1921, upon the decision of the court rendered after a trial at the Bronx Special Term adjudging that the city of New York has no right, title or interest in a strip of land under water on the East river side of Cornell's neck and awarding such strip to the respondents herein, and also from the final judgment entered in said clerk's office on the 13th day of April, 1921.

*John P. O'Brien, Corporation Counsel* [*Charles J. Nehrbas* of counsel; *John J. Mead* with him on the brief], for the appellant.

*Rufus B. Cowing, Jr., Clara A. Salem, Anderson, Iselin & Anderson* [*Francis K. Pendleton* of counsel; *Francis J. Byrne* with him on the brief], for the respondents.

CLARKE, P. J.:

This is an action in partition. The property in question is partly upland and partly land under water. As to the upland there is no question. As to the land under water respondents claim under a grant from the State of New York dated March 10, 1917. The city of New York claims the said grant is invalid upon the ground that the State was not the owner of the land under water purported to be conveyed, but that the title thereto was vested in the city as the successor of the town of Westchester, to which it had been granted by the patent from Governor Nicolls dated February 15, 1667. Said patent contained this description:

" All that Tract of Land togethr wth ye Severall · Parcells not otherwise by Pattent disposed of wch already have or hereaftr shall be Purchased or Procured for & on ye behalf of ye said Towne whethr from ye Native Indian Proprietors or others within ye bounds & Lymitts hereaftr sett forth & Exprest (vizt) That is to say ye Westerne bounds of ye Lands lyeing wthin ye Lymitts of ye said Towne to begin at ye West par of ye Land comonly called Bronckx Land neare or adjoining unto Harlem Ryver from whence they Extend Eastward to ye West parte of a Certaine Neck of Land comonly called Anne Hooks Neck or Mr Pells Purchase Southward they are bounded by ye Sound or East Ryver & so runne upon a Paralell lyne from ye East · & West lymitts North into ye woods without lymitation for Range of Cattle or other Improvemt Togethr wth all ye Lands Soyles Necks of Lands Ryvers Creeks Harbours Quarryes Woods Meadowes Pastures Marshes Waters Lakes fishing Hawking Hunting & fowling & all othr Profitts Comodityes Emolumts & Hereditamts to ye said Land & prmisses within ye said bounds & lymitts described & sett forth belonging or in any wise apperteyning."

In 1686 Governor Dongan made his patent to the freeholders and inhabitants of the town of Westchester ratifying and confirming the prior patent, the description of the land conveyed being the same, except that it provided that the northern boundary of the property should be the southerly line of the patent of Oneal and the south and west lines of Thomas Pell. In 1695 Governor Fletcher ratified and confirmed the prior patents, and all these were ratified and confirmed by an act of the Legislature of the Colony of New York passed May 6, 1691,\* and were further ratified and confirmed by the several Constitutions of the State. The question to be solved is what was meant by the words in the patent " southward they are bounded by the Sound or East River   \*   \*   \*

---

\* See 1 Colonial Laws of New York (Comp. Stat. Rev. Comm.), 224, chap. 2. — [REP.

together with all the * * * rivers, creeks, harbors * * * within the said bounds and limits."

It is clear that these patents granted to the town of Westchester all the rivers, bays and creeks north of the line of the sound. The city claims the lands under water here involved are under the waters either of Westchester creek or Pugsley's creek — in either case they would be included in the patents to the town of Westchester. The respondents contend they are under the waters of the sound and, therefore, the State has the right to convey.

The configuration of the *locus in quo* is as follows: Cornell's neck, ending at the south in Clason point, lies between the Bronx river and Pugsley's creek. Old Ferrry point is bounded on the west by Westchester creek and projects from the main land approximately the same distance as Clason point. The distance between these two points as shown on plaintiff's Exhibit 35 is 2,970 feet. There is then between these two points a bay or indentation.

Eighteen hundred and twenty feet north of the line measured between these points, and where the bay or indentation is 2,700 feet wide, is Castle point, bounded by Pugsley's or Barret's creek to the west and Westchester creek to the east, the waters of these two creeks joining to make the bay or indentation. The precise point to be determined is whether Castle point, bounded by these two creeks, is bounded to the south by the sound or East river, or whether the bay or indentation into which it projects is the confluence of said creeks which do not meet the sound until they reach the line between the headlands, that is to say, Clason point and Old Ferrry point, where deep water is found — the bay being extremely shallow, a narrow channel eight feet deep having been dredged therein for navigation. Where the line between the headlands is reached the soundings suddenly increase from 3 feet to 21 and 32 at low water. The particular land under water in controversy projects into this bay at a point 1,120 feet north from the outer end of Clason point and 700 feet south from Castle point. It is interesting to note that the grant from the State, upon which respondents rely, conveys " all that certain piece or parcel of land *under waters of Westchester Creek* in front of and adjacent to upland of the grantee herein." If the lands conveyed lie under the waters of Westchester creek then it seems clear that the State had no title thereto and the respondents took nothing by the grant. Their effort has been, in repudiation of the plain language of the grant, to show that said lands were not under the waters of Westchester creek but were under the waters of the sound.

The use of the phrase " bounded by the Sound or East River "

was not unusual in ancient grants and has been judicially determined in controversies between communities claiming under Colonial grants and individuals claiming under State grants.

In *Lowndes* v. *Huntington* (153 U. S. 1), the town brought an action of ejectment to recover lands under water in Huntington bay. The town relied upon the grant of Governor Nicolls dated November 30, 1666, and confirmatory grants by Governors Dongan and Fletcher. Huntington being on Long Island, the grant in the description was " on the North to bee Bounded by the Sound runing betwixt Long Island and the Maine " and granted " as also all Havens Harbours Creekes * * * Marshes Waters Lakes." The court said: " It will be seen from these quotations that the boundary on the north, as given in the Nicolls charter, is the ' sound running betwixt Long Island and the Maine,' and in the Fletcher, ' the Sound that Runns between our sayd Isle of Nassaw and the maine Continent.' And the question is whether the tract in controversy is south of this north boundary line. * * * The tract in controversy marked 'A' on this map, is within the limits of what is named thereon ' Huntington Bay.' The contention of the defendant is that that body of water is a part of the Sound, and that, therefore, the north boundary granted to the town of Huntington runs to the south of the tract in controversy. * * * The northern boundaries in all these charters is given as ' the Sound.' That was then, and is now, a well known body of water. It opens into the Atlantic ocean, but is separate and distinct therefrom. Into it flow many rivers, and open many bays, harbors and inlets; but the fact of a connection between them and it does not make them a part of the Sound." After referring to *Rogers* v. *Jones* (1 Wend. 237); *Trustees of Brookhaven* v. *Strong* (60 N. Y. 56, 57) and *Robins* v. *Ackerly* (91 id. 98) the opinion proceeds: " Each of these three cases from the highest court of the State of New York treats that which is named as the boundary on the north or south, the Sound or the ocean, as referring directly to the body of water known by such name, and not as including waters opening into or connected with it." In *Tiffany* v. *Town of Oyster Bay* (209 N. Y. 1), the controversy was between an owner of upland on the westerly shore of Cold Spring Harbor, who had received from the State a grant of lands under water, and the town of Oyster Bay which claimed ownership of all lands under water in Cold Spring Harbor acquired under the patent of Governor General Andros executed September 29, 1677. The court said: " Cold Spring Harbor is not to be deemed a part of the sound within the meaning of the patent unless the term here is to be interpreted differently from the meaning given to it in other similar

grants. In the ancient colonial charters granting land on Long Island in which the sound is named as the boundary on the north, the term refers directly to the body of water known by such name and does not include waters opening into it or connected with it. (Quoting from *Lowndes* v. *Huntington, supra*) * * * The result of this discussion is the conclusion that the whole of the land under water in Cold Spring Harbor and the bay known as Oyster Bay was granted to the town of Oyster Bay by the Andros patent of 1677. It follows that the State had no title to the property which it assumed to grant to Mr. Tiffany as owner of the adjacent upland."

In *Grace* v. *Town of North Hempstead* (166 App. Div. 844; affd., 220 N. Y. 628) the court said: " This is a proceeding to determine the title to the land beneath the waters of Manhasset bay, formerly called Cow bay, a narrow harbor on the north shore of Long Island. * * * It is a mile wide at the entrance, and runs inland upwards of three miles. * * * Plaintiff's lands are along the westerly side of Manhasset bay, about a mile and a half from the sound. This action involves the title to about seven acres fronting on plaintiff's upland, and out in the bay beyond the mean low-water line. Plaintiff relies on a State grant by the Commissioners of the Land Office, made June 24, 1912. Defendant, as successor to the original town of Hempstead, * * * claims to own the waters and bed of this bay by Colonial grants; first from the Dutch Governor Willem Kieft in 1644, and later from Col. Dongan, the English Colonial Governor, in 1685. * * *

" As both the boundary meridian lines run from the sound or East river to the Atlantic ocean, and this bay lies between such meridians, the remaining question is, what is the north boundary of this patent? Here again the import is not doubtful. The sound or East river means the Long Island sound, and the course ' round the points of the necks till it comes to Hempstead Harbour,' plainly means a boundary run around the outer points or headlands of Great neck and Cow neck, by which this bay is plainly comprised. All doubt is removed by the final words ' and the Sound or East River to be the Northerly Bounds ' (*Tiffany* v. *Town of Oyster Bay*, 209 N. Y 1, 7.) And clearly the patent carried title to the land under water within the bounds of the patent. (*Roe* v. *Strong*, 107 N. Y. 350, 358.) * * * Hence it must be held * * * that the State had not title to the property which it assumed to grant to this plaintiff."

It seems to me that in the case at bar the land in controversy lies — as the grant from the State recites — under the waters of Westchester creek which is the larger of the two creeks, the

mouth of which must be held to lie between the two headlands, Clason point and Old Ferry point, where it empties into the sound. In the opinion of my brother SMITH it is suggested that to draw the line of the sound from headland to headland would leave the sound with no shore line. But that proposition seems to be answered by the cases cited. Manhasset bay has an entrance a mile wide, Huntington harbor about two and one-half miles and Oyster bay and Hempstead harbor each have very wide mouths. The Connecticut and other rivers empty into the sound. Can they be said to do so till they pass their headlands? This little bight or indentation, the mouth of Westchester creek is but 2,970 feet wide and very shallow. I do not think it reasonable to hold that it is the sound.

I reach the conclusion that the land in controversy was granted to the town of Westchester and, therefore, the State had no title which it could convey. It follows, therefore, that the judgment in so far as it is appealed from should be reversed, with costs and judgment entered for the appellant with costs. Necessary findings to be submitted on settlement of the order.

DOWLING and GREENBAUM, JJ., concur; SMITH and PAGE, JJ., dissent.

SMITH, J. (dissenting):

The plaintiff has been adjudged the owner in fee of the upland portion of the premises by virtue of certain grants and conveyances beginning with a so-called ground brief from Governor Kieft, dated July 26, 1646, confirmed by letters patent from Governor Nicolls dated April 15, 1667, and ending in the partition judgment. The under-water portion of the premises, being the portion in question on this appeal, comes to plaintiff by certain conveyances beginning with a grant from the State of New York dated March 10, 1917. The city questions the validity of this grant on the ground that the State was not the owner of the lands under water but that the title thereto had vested in the city as the successor of the town of Westchester, which had become the owner thereof by virtue of a patent from Governor Nicolls, dated February 15, 1667. This patent conveys to the grantees a large tract of land bounded westerly by the Harlem river, easterly by the west line of Anne Hooks land and " Southward they are bounded by ye Sound or East Ryver." This patent also grants all " Ryvers Creeks Harbours," etc., with the bounds or limits.

The plaintiff claims that the body of water into which the parcel granted by the State to plaintiff's ancestor extends is a part of the East river or sound and the trial court has so held.

The city claims that this is error and that this body of water is Westchester creek or Pugsley's creek and is no part of East river.

The East river or sound in the general vicinity extends practically east and west and the northerly shore is indented by a number of bays or coves covered at low tide with very shallow water except where the streams running into the bays have made a channel for themselves or the government has created a deeper channel for navigation purposes. One of these bays or coves is between Old Ferry point on the east and Clason point on the west and has an east and west opening of about 3,000 feet and a depth north of about 1,800 feet. About the center of the northerly bounds of this bay is an upland point called Castle point on the east side of which Westchester creek flows in from the north and on the west side Pugsley's creek flows in from the northwest. There has never been any distinctive name to this bay except that on the United States government topographic map surveyed not earlier than 1886 and issued as a map in 1897 the name Westchester creek appears.

The plaintiff has given evidence tending to show that this body of water is a part of the East river or sound. In proving her upland ownership the plaintiff first offered in evidence " a ground brief " dated July 26, 1646, from Governor Kieft to Thomas Cornell, conveying what became known as Cornell's neck, later Clason point. The ground brief has one description as follows: " Beginning from the Kill of Bronck's land, East southeast along the River extending about half a Dutch mile from the River till a little creek over the Valley (Marsh) which runs around this land." Next letters patent dated April 15, 1667, from Governor Nicolls to William Willett, confirming the above ground brief and granting Cornell's neck by the following description: " Whereas there is a certain Parcell of Lands contained within a neck, commonly called and knowne by the name of Cornell's Neck, lying and being on the Maine, towards the Sound or East River being bounded on the West by a certain Rivolette which runs to the Black Rock and so unto Bronkse Creeke or Kill. Then the Neck stretching itselfe East, South East into the Sound it is bounded to the East with another Rivolette which divides it from the limits of West Chester and a line being run from the head of each Rivolette wherewith a narrow slip, the said Neck is joined to the Maine land, it closes up the Neck and makes the North bounds thereof."

Then follow deeds which contain practically the same language conveying different parts of Cornell's neck down to a report of commissioners in partition dated November 14, 1838, which set apart one parcel of Cornell's neck which includes the plaintiff's

premises. The description thereof contains the following: " Thence North twenty nine and three quarter degrees east along the said Sedge lands to Barretts Creek, or the Creek which divides the Clason farm from the Castle hill farm. Thence by and with said Creek as it runs and also along the shore of the Long Island Sound southerly and westerly to the place of beginning," which report was confirmed and parcel allotted by decree dated January 15, 1839. This description is followed in later conveyance and confirms the title to the uplands in plaintiff.

The plaintiff claims from these different descriptions that the conveyances from the Nicolls patent to the present time show that Cornell's neck was bounded on the east (as well as on the south) by the East river or sound and that this can only be so if the bay or cove above mentioned is a part of the East river.

As further confirming this claim the plaintiff introduced many deeds showing that from about 1678 to within recent years the Castle Hill point was described as bounded on the south by the " Sea " or " East River " or " Sound." The deed dated December 12, 1678, of Ponton to Richardson of land on Castle Hill neck contains this as part of the description: " West side of said Neck." Said " land boundeth to the South and to the West by the Sea." The deed dated July 20, 1687, from Veale to Richardson of the east side of Castle Hill neck, contains the following: " The East side is bound by the Mouth of Westchester Creek." The deed dated May 30, 1721, bounded Castle Hill neck as follows: " Southerly to ye Sound, Northerly to ye Common, Easterly by ye Great Creek and Westerly by ye Little Creek commonly called West Creek." Deeds dated November 7, 1721, August 17, 1723, and May 20, 1725, contain the same description.

Several other conveyances have the same general description of Castle hill as bounded " Southerly by the Sound," down to the partition description August 1, 1872, when a rather more extended description occurs as follows: " to low water mark in the Westerly shore of Westchester Creek; then along the low water line on said shore as it winds and turns the following average courses and distances viz: S 40° 52' W 818 feet; S 180° 45' W 750 feet; S 37° 5' 465 feet; S 30° 48' W 771 feet to the Mouth of Westchester Creek; then along the low water line on the northern shore of the East River or Sound as it winds and turns the following courses and distances, viz: S 87° 21' W 187 feet; N 56° 51' W 146 feet to the Mouth of West Creek so called; thence along the low water mark on the easterly shore of said West Creek as it winds and turns."

The above is a description of Castle Hill neck and the first four

courses are along its easterly side; the next two courses are along the southerly side of Castle Hill neck " on the northern shore of the East River or Sound," and the " Mouth of Westchester Creek " is shown to be no further south than the southeast point of Castle Hill neck, and the " Mouth of West Creek so called " no further south than the southwest point of Castle Hill neck.

Ancient and contemporaneous acts and conveyances of adjacent properties are entitled to great weight. (*Jackson* v. *Wood*, 13 Johns. 346, 348; *Livingston* v. *Ten Broeck*, 16 id. 14, 22, 23; *Town of North Hempstead* v. *Eldridge*, 111 App. Div. 789, 793; *Trustees of Brookhaven* v. *Strong*, 60 N. Y. 56, 72.)

There can be very little doubt that the body of water in question has been considered a part of East river or the sound down to the time of the grant from the State dated March 10, 1917, which for the first time bring into the description of lands conveyed the words " under the waters of Westchester Creek." The patent from Governor Nicolls describes Cornell's neck as bounded westerly by a rivolette down to Bronx river, then the neck proper extending into the sound and bounded easterly by another rivolette. Looking at the map, defendant's Exhibit D, which most clearly shows these rivolettes, it is very apparent that the rivolettes mentioned are the small streams which come together very nearly at the northwest boundary of Cornell's neck as the description in the Nicolls patent says. The westerly rivolette in the description runs only to Bronx river from which point the " Neck proper extends East, Southeast into the Sound." This clearly means that the southerly portion of Cornell's neck is bounded on the west by the sound, on the south by the sound and on the east by the sound, and that farther up on the east the other rivolette forms the easterly boundary. A later description in plaintiff's chain of title says southerly down Pugsley's creek and then " Southerly and Westerly along the Sound." This *southerly* " along the sound " is only correct on the theory that the easterly shore of Cornell's neck bounds on the sound. The several descriptions of lands on Castle hill give the southerly and in one instance the westerly boundary of those lands as the sound and the several mentions of Westchester creek and Pugsley's creek show that those creeks terminate at the southerly side lines of Castle point.

The city's claim of title to the land in question is founded on the patent from Governor Nicolls to the town of Westchester dated February 15, 1667, in which patent the southerly boundary is given as above quoted " Southward they are bounded by ye Sound or East Ryver." The contemporaneous patent of Cornell's neck dated April 15, 1667, and other old deeds clearly indicate

that the sound or East river came up to Castle point. The claim of the plaintiff is based on this patent of April 15, 1667, which is dated two months after the patent on which the city's claim is based. *But* two things are significant in those patents. 1. The plaintiff's patent expressly recites the earlier " Patent or ground brief " to Thomas Cornell dated July 26, 1646, and confirms that title in William Willett who is shown to be the successor of Thomas Cornell in the title to Cornell's neck. 2. The patent on which the city founds its claim expressly says it grants the tract of land described " not otherwise by pattent disposed of." These recited facts clearly show that the city's patent conveyed nothing that was conveyed by the plaintiff's patent. The plaintiff's patent as has been clearly shown conveyed all of Cornell's neck at the place in question as bounding on the East river or sound.

A further fact is significant in this connection. In the city's patent, Exhibit A, the grantees are certain named individuals " and their associates." The city's Exhibit B, Dongan patent dated January 6, 1686–7, refers to the patent of February 15, 1667, and confirms it and mentions among others as freeholders William Richardson and Richard Ponten. By plaintiff's Exhibit 38 Richard Ponton conveys to William Richardson a part of Castle Hill neck by a description of land " boundeth to the south and to the west by the Sea." Thus we have two of the persons mentioned in the last above patent describing Castle hill as bounded by the " Sea." The city is, therefore, not the owner of the land under the water of bay or cove by virtue of the above patent.

To further support its position the city claims that the northerly bounds of the East river or sound should be considered as a line drawn from headland to headland, that is at the bay or cove in question that line should be drawn from Clason point to Old Ferry point, or at least from Clason point to Castle Hill point and that in either event the plaintiff's under-water land would be excluded from the East river or sound. This claim of the city is founded on *Tiffany* v. *Town of Oyster Bay* (209 N. Y. 1); *Lowndes* v. *Huntington* (153 U. S. 1); *Grace* v. *Town of North Hempstead* (166 App. Div. 844; affd., 220 N. Y. 628), and *Robins* v. *Ackerly* (91 id. 98). These cases all have to do with lands under the waters of bays or harbors *which have always been known by distinctive names* and were used as boundary lines in grants from the Governors in the late seventeenth century. The *Lowndes* case had to do with Huntington bay on the north shore of Long Island and the court held that that bay was a separate body of water. This was based on several considerations the most important being that in an old grant of Eaton's neck from Governor Nicolls dated June

22, 1667, that promontory of land is described as bounded on the west by Huntington bay. There is no indication in the opinion that the town of Huntington claimed that the north bounds of Huntington bay was a line drawn from " Lloyd's Neck Point " on the west to " Eaton's Neck Point " as suggested by Mr. Carten in his argument. In fact there is some evidence that town claimed the northerly boundary of Huntington bay to be a line drawn from somewhere near the Eaton's Neck point to the nearest point of Lloyd's Neck by a course described in the act of the Legislature (Laws of 1888, chap. 279), which would bring it out at a point marked " East Fort " on the map set out in the opinion in the *Lowndes* case. The *Tiffany* case was a dispute over land under the water of Cold Spring harbor, an inner extension of Oyster bay, which bay is similarly described in old grants.

The shore line in the sound must be considered as following the sinuosities of the shore. In *Tiffany* v. *Town of Oyster Bay* (209 N. Y. 1, 9), the court says: " In the absence of language clearly indicating a different intent, grants of land bounded by the sea or a navigable river where the tide ebbs and flows carry the title only to high-water mark." In the same case in 141 Appellate Division, 720, both the prevailing and dissenting opinions refer to the north bounds of the old grant as " following snugly the shore line " " must follow the sinuosities ' Along the Sound,' " and " shall follow the changing directions of the north shore." Any other interpretation, such as contended by the city, that the line of the sound should run from headland to headland would cut off all the indentations in the shore line of the sound. In short the sound would have no shore line. It is only where the indentations of the shore line are deep into the land *and have been known by particular names*, that they are considered as separate bodies of water. The other contention of the city that the line should run from Clason point to Castle point is equally unsound for the above reasons and further because the easterly side of " Cornell's Neck Proper " could not be bounded by the " East River or Sound " if such a proposed line were to be taken as the west boundary of East river. Furthermore such a line could create a physical absurdity as the East river with such a line in this cove would have no shore line. An additional point is made that the northerly shore of East river should be considered to be a natural shelf running across between headlands. This natural shelf is called a " shoal bight " or natural subaqueous division. This " shoal bight " is shown on some of the maps and is a division between the deep channel of the river, and the shallow water as the river approaches the shore; it extends all along some distance

from both shores of the river and the effect of holding such a division line to be the river line would be to cut off all shores and islands from the river. This " shoal bight " claim claims too much as it would give to the city all lands under water between the high-water mark and this shoal bight.

The conclusion must be that the sound or East river follows high-water mark around the cove into which Westchester creek and Pugsley's creek flow and that Pugsley's and Westchester creeks do not extend south of the southerly boundary of Castle hill. The plaintiff's title to the land under water from the State is, therefore, good and the judgment should be affirmed, with costs.

PAGE, J., concurs.

Judgment so far as appealed from reversed, with costs, and judgment ordered for the appellant, with costs. Settle order on notice.