John C. Marbach, J.
Who owns the bed of Titns Mill Pond? Titus Mill Pond is located on the northeasterly portion of a body of salt water known on maps as New Rochelle Creek. The waters in this inlet creek and pond are from Long Island Sound, with tides up to eight feet in the inlet and with no fresh water stream entering into it.
Claiming title from a royal patent of 1666, plaintiffs, in an attempt to construct a multi-family apartment house by filling in this approximately 11-acre pond, have brought a declaratory judgment action to declare the zoning classification permitting one-family dwellings as unconstitutional as it applies to plaintiffs’ property. The city moves for summary judgment, claiming that plaintiffs do not own the fee to the bed of the pond, either by tracing their title to the royal grant or by adverse possession; and therefore, if they do not own it, they cannot be aggrieved by the zoning classification applied to it and they can have no standing to attack the ordinance. The city also asserts riparian rights as the upland owner of property which would prohibit plaintiffs from filling or building in the pond regardless of the zoning. The State of New York has been granted leave to intervene in this action in order to assert a counterclaim claiming that this pond is really an arm or an inlet of that portion of Long Island Sound which became the property of the State as a result of the American victory in the Revolutionary War. Plaintiffs allegedly obtained title on February 15, 1968, from Helvetia Realty Company, and as part of their claim they cite the fact that they have paid taxes on the property since that date. In order to resolve the conflicting claims of title, this court must examine the history, grants and maps which involve this pond as well as, of course, the applicable statutory case law.
*164 In 1654, in a bold attempt to extend English hegemony in the New World at the expense of the Dutch, and in particular tq/the area that is now eastern Westchester County, Thomas Pell purchased 9,160 acres from the Siwanoy Indians. This purchase was evidenced by a treaty (an unreadable copy of which is reproduced in Ancient Town of Pelham [Barr], p. 12, Dietz Press, Richmond, Va., 1946). It further appears that the Siwanoy tribe had already sold the same land to the Dutch. Unlike the Dutch, however, Pell settled and took actual physical possession of this land. On his death in 1669, the inventory appraisal value of these 9,160 acres was $3,100, or about 40 cents an acre. This land encompassed what is now the City of New Rochelle, the Town of Pelham, and portions of Eastchester and the Town of Mamaroneck.
The English expelled the Dutch from New York in September of 1664. In 1666, King Charles II, through Richard Nicholls, the first English Governor of New York, confirmed Pell’s treaty of 1654 with the Siwanoy by issuing to Pell a royal patent. At Pell’s death in 1669, the land obtained by royal patent was bequeathed to his nephew, John, who received a confirmatory grant by patent from Governor Dongan in 1687. In 1687, Davenport Neck, one of the islands, and some land on the water to the east were sold to Leisler for a 1 ‘ trial ’ ’ settlement by some Huguenots. (Barr, supra, p. 48.)[1] In September, 1689, John Pell and his wife conveyed about 6,100 acres to Jacob Leisler, who had been commissioned by the Huguenots to purchase the land (see 1703 map opposite page 50 of New Rochelle town history). These two tracts became the Town and then the City of New Rochelle. Titus Mill Pond derived its name from Samuel Titus, who owned the land and operated the grist mill constructed in 1724 by Anthony Lispenard. This mill has long since ceased to function. Through mesne conveyances from predecessors in title, the title to the land under the pond is now allegedly in the present owner.
THE GRANTS AND MAPS
The grant of 1666 from Governor Nicholls really confirmed the purchase by Pell from the Indians in 1654. This may be seen from the terms of the grant itself which, after describing the boundaries of the grant, states that ‘1 said Tract of Land hath heretofore beene Purchased of the Indyan Proprieto18 ” The grant itself describes the boundaries as follows: ‘1 lying and being to the Eastward of the Bounds of the Towne of Westchester Bounded to the Westward with the River called by the *165 Indyans Aqueonuncke commonly knowne to the English by the Name of Hntchinsons River which Runeth into the Bay lying betweene Throckmortons Neck and Ann Hookes Neck commonly called Hntchinsons Bay Bounded on the East by a Brooke called Cedar Tree Brooke or the Gravelly Brooke on the South by the Sound which lyeth betweene Long Island and the Maine Land with all the Islands in the Sound (not already Graunted or otherwise disposed of) lying before that Tract of Land so Bounded as is before exprest And Northwards to run into the Woods about Eight English Miles in Breadth as the Bounds to the Sound which said Tract of Land hath heretofore beene Purchased of the Indyan Proprietor and due Satisfaction given for the same Now Know Yee That by vertue of the Comifsion and Authority unto mee given by his Royall Highnefse James Duke of Yorke &c upon whom by Lawfull Graunt and Patent from his Maty the Propriety and Government of that Part of the Maine Land as well as of Long Island and all the Islands adjacent amongst other things is Settled I have thought fitt to give Graunt Confirme and Ratify And by these Presents do Give Graunt Confirme and Ratify unto Thomas Pell of Onckway alias ffairfeild in his Maties Colony of Conecticott Gent his Heires and Afsignes all the said Tract of Land Bounded as aforesaid Together with all the Lands Islands Soyles Woods Meadowes Pastures Marshes Lakes Waters Creekes ffishing Hawking Hunting and Howling and all other Proffitts Commodities Emoluments and Hereditaments to the said Tract of Land and Islands belonging with their and every of their Appurtenances and of every Part and Par cell thereof.”
The confirmatory grant by either patent of 1687 from Governor Dongan to John Pell recites the original grant of 1666 and it reads as follows: “all that Certaine Tract of Land, upon the main Lyeing and being to the Eastward of Westchester bounds Bounded to the Westward with the River Called by the Indians Aqueonounck Commonly knowne to the English by the Name of Hutchins ons River which Runeth into the Bay lyeing between Throgmortons Neck & Anne Hoocks neck Commonly Called Hutchins ons Bay Bounded on the East by a Brook Called Cedar Tree Brook or Gravilly Brook on the South by the Sound which. Lyeth between Long Island and the main Land with all the Islands in the Sound (not before that time Granted or otherwise Disposed oH) Lyeing before that Tract of Land so Bounded as is before Exprest and Northwards to Runn into the woods about Eight English miles the Breadth to be the same as it is along by the Sound together with all the Lands Islands Soyles *166 Woods Meadows Pastures Marshes Lakes Waters Creekes fishing hawking hunting and fowling & all other Proffitts Commodities Emolumts to the said Tract of Land & Islands belonging with their and every of their Appurtences & every pte & pcell thereof. ’ ’
There is no dispute over the existence or authenticity of any of the above-described grants. It is only what was a part of these grants and in particular the Titus Mill Pond that is at issue. The earliest map of the area in question that is a part of this record is a 1711 map contained in records of the Town of New Rochelle 1699-1828 published in 1916 by Jeanne Forbes. On page 70 there is attached this 1711 map which is a survey of the property conveyed by Pell to Leisler which indicates that the disputed area is known as New Rochelle Creek and that it is bounded on the east and south by Newburry Davenport Neck. A deed dated 1814 indicates that, when what is now Davenport Neck was conveyed, it referred to Titus Mill Pond on the north and east and to the mouth of New Rochelle Creek on the south as part of its boundaries. The above deed and grants as well as maps marked Exhibits 2, 3, E, F, Gr, H and I would support the arguments of plaintiffs that this is not an arm or inlet of the sound which is a part of the sound but is really a separate creek which has had its own separate identification for over 250 years. Since Titus Mill Pond is located at the end of the creek furthest from the sound and closest to the mainland, the argument is made that all of what is referred to as New Rochelle Creek was part of the grant. Of course, at the time of the grant, there was no Titus Mill, so the court must construe the grant without reference to the mill. However, it is important to note that the early acts of first settlers in erecting a dam in 1724 were inconsistent with any recognition of exclusive control and title in the king. The map of 1711 calls the stream “New Rochelle Crick ’ ’, certainly an assertion of a designation consistent with private title.
The central issue before this court is whether Titus Mill Pond and the lands under it were within the description contained in the Nicholls and Dongan Patents. The position of the parties has been outlined above and boils down to a dispute as to whether the bed of Titus Mill Pond is part of a separate body of water known as New Rochelle Creek that is within the descriptions contained in the grants and, therefore, the property of the plaintiffs, or is it in fact an arm or inlet of that portion of Long Island Sound below the high-water mark which is the property of New York State.
*167 The court finds that the bed of Titus Mill Pond is the property of plaintiffs.
The grants of letters patent contained the metes and bounds description which referred to the southerly boundary as being [1] ‘ the Sound which lyeth betweene Long Island and the Maine Land with all the Islands in the Sound (not already Graunted or otherwise disposed of) ”. The physical facts existing in the locus in quo have been examined by this court and reveal that what was originally Titus Mill Pond has been filled in by the city at its northeasterly portion and bisected by the construction of Church Street, leaving the disputed area to the west of Church Street. The remains of the mill dam which form the southeasterly boundary of the pond are visible. What is called New Rochelle Creek on the maps is bounded by private marinas, and the creek then opens to a large body of water which surrounds what is known as Glen Island and which waters also flow around Davenport Neck. As indicated above, the waters are tidal waters flowing into the creek from the sound. But the relative relationship of Davenport Neck, the sound, the creek and the islands, the probable ‘ ‘ headland ” points, and surrounding rivers on the boundary of the grants are unchanged from the earliest map available- — the 1711 one. There is no basis to believe any change in controlling physical conditions occurred between 1666 and 1711.
In addition, while there are numerous cases cited to the court, the application of the law is completely dependent upon the physical facts existing on the site in dispute.
In the common law, the king owned the arms of the sea and the navigable rivers wherein the tide flowed. (Hale, de Jure Maris, ch. IV, as set forth in Moore, Foreshore and Seashore [3d ed.], pp. 370-413; Rogers v. Jones, 1 Wend. 237 [1828].) The king could divest himself of this right to lands under water by royal charter or grant or a subject could acquire lands under water by custom or prescription. (Rogers v. Jones, supra.)
Grants from the crown are subject to the rules set forth as follows by Lord Hale and by the courts in Rogers v. Jones (supra, p. 255):
“ It is contended by the plaintiff, that the town has no right of property in the lands where the oysters were taken, because the right of soil beneath the water in the harbor of Oyster-Bay never passed by the terms of the patent.
‘ ‘ It cannot be doubted, that when a patent or grant conveys a tract of land by metes and bounds, the land under water as *168 well as other land will pass, if the land under water lies within the bounds of the grant.”
This is only so, however, if the grant is unambiguous. What about a grant, such as this, which is arguable. The landmark case in this area is Lowndes v. Huntington (153 U. S. 1 [1894]). The Supreme Court, per Justice Brewer, held, in construing the provisions of a grant made November 30, 1666, confirmed in 1688, that the grant operated to convey to the grantee the lands under tide water in Huntington Bay which were involved in a dispute over oyster beds, by virtue of the fact that since Lloyd’s Neck and Baton’s Neck were within the grant so was the harbor. The Supreme Court relied upon Rogers v. Jones (supra [Oyster Bay]); Trustees of Brookhaven v. Strong (60 N. Y. 56 [Great South Bay]); Robins v. Ackerly (91 N. Y. 98 [Northport Harbor]), all of which involved other Long Island bodies of water and all of which contained descriptions similar in wording in that they referred as a boundary either to “ the Sound ” (Rogers, supra; Robins, supra) or “the sea or main ocean” (Brookhaven, supra). It should also be noted that these bodies of water are far larger in area than the instant body.
Furthermore, the Supreme Court arrived at its decision by analogy, stating at Lotvndes (pp. 25-26): “ The patent under which the plaintiff claims is bounded on the north by the Sound. Adjacent to the Sound is Baton’s Neck and Baton’s Neck Beach and south of this is Northport harbor. By analogy, both Baton’s Neck and Baton’s Neck Beach are within the patents and necessarily the harbor also.”
In the case at bar, the grant was to the sound including all the islands in the sound (not already granted or otherwise disposed of). This would indicate to this court that if islands in the sound were part of this grant then a relatively small body of water which cuts into the shoreline and north of the stated southern boundary is within the scope of the grant.
Lowndes v. Huntington (supra) contains language which indicates that if the language of the grant is clear, it controls. If it is clear, then it is not limited by any ambiguity that is stated in the appurtenances clause. (Lowndes v. Huntington, supra, p. 21.) If it is not clear, then the grant law seems to be that the appurtenances clause may be considered to resolve the ambiguity by ascertaining the intention of the grantor. (Trustees of Brookhaven v. Strong, supra, pp. 71, 72.) The appurtenances clause in these grants refer to all the ‘ ‘ Lands Islands Soyles Woods Meadows Pastures Marshes Lakes Waters *169 Creekes ”. A creek is defined in Webster’s Collegiate Dictionary (5th ed.) in the following manner: “ creek * * * 1. A small inlet or bay, narrower and extending farther inland than a cove. 2. Hence, Chiefly U. S., a stream of water smaller than a river and larger than a brook. 3. Dial. A narrow or winding passage.” This would seem to the court to be an accurate description of the body of water involved in the action and it apparently seemed so to our forefathers in 1711 and subsequent thereto since the earliest maps refer to this body of water as New Rochelle Creek. If it is a creek, and the court finds that it is, then it is clearly within the scope of the appurtenances clauses in the grants of letters patent of 1666 and 1687 and is plaintiffs’ property.
Bliss v. Benedict (202 App. Div. 115 [1st Dept., 1922]) reached the same result and is factually related to the case at bar. The land under water was located in a bay in New York City, in The Bronx, between two headlands. The bay between the headlands was formed by the confluence of two creeks and the distance between the headlands was nearly 3,000 feet. The southern boundary of the colonial patent was ‘1 the Sound or East River ’ ’. The court held that the sound was located south of the line drawn between two headlands, and since the land under water was located to the north of such headland line it was included within the bounds of the patent. In this case, a line drawn between the headlands of the mouth of New Rochelle Creek in any direction would encompass Titus Mill Pond within the scope of the grant. Again, if the bay in Bliss {supra) or the other bodies of water in the cases previously cited are not within the sound, it is difficult to see how this smaller, narrower body of water with the pond at its interiormost reach is within the sound. As was said in Tiffany v. Town of Oyster Bay (209 N. Y. 1, 7-8): 1 ‘ In the ancient, colonial charters granting land on Long Island in which the sound is named as the boundary on the north, the term refers directly to the body of water known by such name and does not include waters opening into it or connected with it. (Lowndes v. Huntington, 153 U. S. 1, 22, 27.) ‘ The northern boundaries in all these charters is given as “ the Sound.” That was then, and is now, a well known body of water. It opens into the Atlantic Ocean, but is separate and distinct therefrom. Into it flow many rivers, and open many bays, harbors, and inlets; but the fact of a connection between them and it does not make them a part of the Sound. ’ ” (See, also, Grace v. Town of North Hempstead, 166 App. Div. 844 [2d Dept.], affd. 220 *170 N. Y. 628.) It is quite true that Westchester is not Long Island and it is also true that these cases are not directly in point, but they are analogous and in some cases even stronger in support of plaintiffs’ position and they are persuasive with this court.
The State has made a valiant attempt to support its contention that it is the owner of all lands under the waters of Long Island Sound up to mean high-water line. (Public Lands Law, § 4; People v. New York & Staten Is. Ferry Co., 68 N. Y. 71; People v. Steeplechase Park Co., 218 N. Y. 459, and in particular Matter of City of New York [American Pres. Lines] 281 App. Div. 315 [1st Dept. 1953], affd. 3 N Y 2d 775 [1957].) The State’s brief cites American Pres. Lines in detail and its argument relies to a large extent on this case. In this case, the land under water was located in a cove between Barretto and Hunts Point, in The Bronx. Into this cove emptied the Sacrahong Creek and the Causeway Creek. The City of New York claimed title to the land under water in the cove on the basis of three colonial patents which gave the southern boundary of the land conveyed as the sound. The First Department, in reversing the lower court, rejected the headland-to-headland line drawn between Barretto and Hunts Point. The court found that the cove was merely a curvature in the shoreline of the sound or East River and was not included in the patents but was granted to claimant by a State patent. This court believes that much of the language in the case supports the finding herein since the court at page 327 said that ‘ ‘ The appurtenance clauses in the town grants did include rivers, creeks and harbors. But the bay is neither a river, a creek, nor a harbor, and in any event the cases last cited do not justify extending the limits of the grant because of the nature of the appurtenance clauses.”
Likewise, at page 331, the court noted that:
‘ ‘ Here we have no body of water known as a separate river, which could be said to maintain its identity as such until it passed a line drawn from Hunts Point to Barretto Point, a body of water to which a particular name distinctive from the Sound was assigned historically or in any conveyances. We could hardly conceive anyone describing the bay in question as Sacrahong Creek or Causeway Creek. * * *
“ The present bay is a comparatively small bay or cove on a headland, and not as deep as it is broad at the mouth. It does not appear that it was ever known as a separate body of water, and has always seemed to have been treated as a mere curvature of the shore of the ‘ Sound ’.
*171 [1] ‘ Another point of distinction in the present case is that here we have had no long continued exercise of control of these submerged lands on the part of the Town of Westchester or its successor, the City of New York. Not only has there been no attempted control, but at least in modern times the city has continuously taxed the area as land in private ownership.”
The case at bar is distinguishable, since it involves a creek and has been known for 260 years as a separate body of water and the city has conceded it has assessed and taxed this land to plaintiffs’ predecessor. The court finds that American Pres. Limes (supra) is limited to its own particular fact situation.
Therefore, the court finds that plaintiffs have title. In so finding, it is not necessary to decide plaintiffs’ claim to the property by adverse possession except to note that, under New York law, adverse possession does not ripen into either title or undisturbable possession against the sovereign.
The court rejects the claim by the city that it is an upland owner bordering on Titus Mill Pond and, therefore, has riparian rights. The history of the city’s title to' the property and the fact that Church Street is a filled-in street show that the city never owned uplands bordering on Titus Mill Pond and that Church Street is not upland bordering on Titus Mill Pond (see United Paper Board Co. v. Iroquois Pulp & Paper Co., 226 N. Y. 38 [1919]; Matter of Del Balso Holding Corp. v. McKenzie, 271 N. Y. 313 [1936]; Township of Hempstead v. Oceanside Small Graft Marina, 64 Misc 2d 4). After filling in the portion of Titus Mill Pond that it owned, it did not become an upland owner, since land under water is still treated as land under water even after it is filled in. (City of New York v. Wilson & Co., 278 N. Y. 86.)
The title of the city to that filled-in portion of the pond rests on the same chain of title from Leisler that is the basis of plaintiffs’ title. The city concedes the plaintiffs’ record title is good, if the creek and pond were within the Pell grant. The State does not question the title other than to claim the area is excluded from the Pell grant and, therefore, retained by the sovereign.
The court wants it clearly understood that it is not deciding any other questions, such as the validity of the zoning ordinance, any questions of self-imposed hardship which may arise, any right to permits from anyone having any jurisdiction over the proposed development, any riparian rights of other adjacent owners, or any other question not referred to in this opinion, be it ecological, legal or jurisdictional.
*172 Motion for summary judgment by the city and by the intervener State on its counterclaim is denied. Summary judgment is granted to plaintiffs declaring them to have good and valid title.

. The following quotation is from the volume referred to in the opinion, Ancient Town of Pelham, by Lockwood Barr, published by Dietz Press, Richmond, Virginia, and kindly made available to the court by W. Arthur Slater of Ossining, a member of Westchester’s Historical Society:
“ The French Huguenots, who had fled their homelands because of religious persecution, came to New York not only from Europe, but from the West Indies. Jacob Leisler, a Dutchman, was then one of the leading citizens and merchants of New York City. He was commissioned to find a place for these refugees, nearby New York City.
“ Jacob Leisler and a small group of Huguenots had made what appears to have been a preliminary purchase of the tract of land now known as Davenport’s Neck, and the adjacent island, now Fort Slocum. The number of Huguenots continuing to arrive in New York so increased that there resulted a contract on July 2, 1687, between Jacob Leisler and Sir John Pell, for a large tract of land on the mainland. In the fall of 1688 the settlement was well established.
“ On September 20, 1689, Sir John Pell and his wife, Rachel, conveyed to Jacob Leisler for 1,675 pounds, 6,100 acres of land, or about a dollar and forty cents an acre. From this it will be seen that the arrangements for the settlement of New Rochelle by the Huguenots was made in New York, not in Europe, as is so often stated in the histories of New Rochelle.
“In addition to the purchase price, '* * * said Jacob Leisler, and his heirs and assigns, agree to yield and to pay unto said John Pell and his heirs and assigns, Lords of the said Manor of Pelham, as an acknowledgement to Lords of said Manor, one Fatt Calfe on every four and twentieth day of June yearly and each year for ever * * * if demanded * * * ’ Incidentally, 'that token payment continued to be paid for many years!
“ The actual date of the settlement of New Rochelle has not been established beyond doubt; however, there is evidence it was before 1687. The Huguenot settlers, consisting of merchants, artisans and craftsmen, as well as farmers, landed at Bonnefoy Point in Hudson Park.. There, on a boulder is a Bronze Tablet commemorating the landing. They named their little settlement New Rochelle, after La Rochelle, France, whence a substantial number of them had come.”

. This court was trial counsel for the defendant in Huguenot Yacht Club v. Lion (43 Misc 2d 141) in which land to the west was involved, and the court cited the ownership of the State to land under water, calling it a “ navigable arm of Long Island Sound” (p. 142). These parcels were opposite Glen Island, one of the “ islands in the sound ” referred to in the royal patents here. The water was not that stream north of Davenport Neck. Neither party there questioned the title of the State.